Leona WALKER, Gene Clark, Lucille Jones, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Samuel R. PIERCE, Jr., in his official capacity as Secretary, United States Department of Housing and Urban Development; United States Department of Housing and Urban Development, an agency of the United States, Defendants.

No. C–87–2628 RFP.

United States District Court,
N.D. California.

July 6, 1987.

Edward G. Weil, San Francisco Neighborhood Legal Assistance Foundation, San Francisco, Cal., Catherine M. Bishop, National Housing Law Project, Berkeley, Cal., for plaintiffs.

Michael Sitcov, Asst. U.S. Atty., U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

## MEMORANDUM AND ORDER GRANTING PRELIMINARY INJUNCTION

PECKHAM, Chief Judge.

### INTRODUCTION

The plaintiffs in this class action seek a preliminary injunction halting the sale by the Department of Housing and Urban Development ("HUD") of mortgages on several hundred multifamily housing projects located throughout the nation. Specifically, the plaintiffs request an injunction prohibiting the defendants from:

a. proceeding with the closing or other execution of any contracts entered into pursuant to the sale of mortgages listed in the May 1, 1987 Announcement of HUD Project Mortgage Sale ("Sale Announcement") or the May 1, 1987 Request for Purchase Proposals ("Request for Proposals").

b. offering for sale or accepting bids for any of the mortgages identified in the Sale Announcement or Request for Proposals upon the terms and conditions stated in the Sale Announcement and Request for Proposals.

c. offering for sale or accepting bids on any of the mortgages identified in the Sale Announcement or Request for Proposals upon any other terms or condi-

tions without notice to plaintiffs' counsel and approval of the court.

The court grants the preliminary injunction as requested.

## STATEMENT OF FACTS

On May 1, 1987, HUD announced that it would sell approximately 311 mortgages on multifamily housing projects located throughout the nation. *See* Declaration of Morris Bourne, ¶ 5 and Exh. B (filed June 23, 1987) (hereinafter "Bourne Decl."). These mortgages fall into two general categories. The "assigned mortgages," which comprise the majority of the sale, are mortgages that were previously insured by HUD under eleven different sections of the National Housing Act, 12 U.S.C. §§ 1701 *et seq.*, and were assigned to HUD when the owners of the housing projects defaulted on the mortgages. The "assigned mortgages" also include some loans that were current when assigned to HUD under section 221(g)(4) of the National Housing Act, 12 U.S.C. § 1715*l*(g)(4). *See id.* ¶ 6. The second category of mortgages offered for sale are "purchase money mortgages" ("PMM's"), which were originated by HUD in connection with the sale of formerly HUD-owned housing projects. Before HUD owned these PMM projects, they were also insured by HUD under various provisions of the National Housing Act. *See id.*

HUD's May 1, 1987 Sale Announcement states that the mortgages will be sold to the highest bidder in two phases. In the first phase, which occurred on June 2, 1987, HUD solicited bids for each of the 311 mortgages. *See id.* ¶ 5. Thirty-one mortgages were sold during this phase, although the defendants have stipulated that the sales will not be closed until July 8, 1987. *See* Stipulation in Lieu of Temporary Restraining Order at ¶ 5 (filed June 1, 1987) (hereinafter "Stipulation"). Of these 31 mortgages, six were PMM's, and 18 were sold to the project owners. *See* Bourne Decl. ¶ 17. During the second phase, the mortgages not sold in the first phase (with the exception of certain PMM's), will be sold as a group to a legal entity or issuer not sponsored or insured by

HUD or any other branch of the federal government. That entity will securitize the mortgages and sell the mortgage-backed securities to competitively selected underwriters, with HUD receiving a percentage of the gross proceeds. *See* Stipulation ¶ 3.

All of the projects subject to mortgages that are included in the sale at issue here are governed by Regulatory Agreements between HUD and the project owners. These Regulatory Agreements remain in effect as long as the mortgage is insured or held by HUD. *See* Bourne Decl. ¶ 11. There are different Regulatory Agreements in effect for the various HUD insurance programs and types of project owners. *See id.* The provisions typically included in these Regulatory Agreements include the following: (1) rent controls; (2) limitations on security deposits, admission charges, and other charges to tenants; (3) a requirement that the project be maintained in good repair and condition; (4) a prohibition of discrimination against families with children; and (5) a requirement that a reserve fund for repairs and replacement be maintained and used as approved by HUD. Because HUD intends to sell the mortgages without insurance, these Regulatory Agreements will terminate when the mortgages are sold. *See id.* Exh. B (letter of May 1, 1987 from Thomas T. Demery).

The May 1, 1987 Sale Announcement provides that certain PMM's executed after October 31, 1978 may be purchased only if the purchaser is able to get the project owner to sign a corrective deed. *See id.* Exh. B (Sale Announcement at 2–3). This corrective deed would extend certain provisions of the Regulatory Agreement that would otherwise terminate upon the sale of the mortgage. The Sale Announcement makes clear that the reason for requiring such a corrective deed is that "these provisions have a statutory basis and the Regulatory Agreement containing them will terminate upon sale." *Id.* Specifically, the provisions to be included in the corrective deeds are the following: (1) nondiscrimination against holders of Section 8 Housing Certificates (to comply with 12 U.S.C. § 1701z–12); (2) maintenance of the hous-

ing project as rental housing for a specified number of years (to comply with 12 U.S.C. § 1701z–11(c)(3)); (3) agreement to operate the project in accordance with any existing Section 8 Housing Assistance Payment ("HAP") contract (to comply with 12 U.S.C. § 1701z–11(a)); and (4) other special provisions of certain Regulatory Agreements, including HUD eviction procedures and agreement to renew Section 8 assistance or accept further Section 8 assistance if offered by HUD. *See* Bourne Decl. ¶ 15 and Exh. B (Sale Announcement at 2–3). No corrective deeds will be required by HUD for the assigned mortgages.

HUD has previously sold mortgages on other multifamily housing projects. Between March 1982 and July 1984, HUD conducted eight mortgage auctions, resulting in the sale of 449 mortgages. In the first six auctions, HUD offered mortgage insurance to the purchasers. On February 16, 1984, the Office of Management and Budget ("OMB") issued a directive barring the provision of mortgage insurance in connection with such sales. The next two auctions were therefore conducted without insurance. Investor interest in the mortgage sales dropped considerably when HUD ceased offering mortgage insurance. In the two sales preceding the OMB directive, HUD sold 85 and 53 mortgages, respectively. In the two sales following the directive, HUD sold only 17 and 9 mortgages, respectively. An auction of mortgages scheduled for November 1986 was cancelled for lack of interest. *See* Bourne Decl. ¶ 3 and Exh. A.

## DISCUSSION

### I. Standards for Preliminary Injunction

In the Ninth Circuit, there are two interrelated standards for the issuance of a preliminary injunction. In order to qualify for such relief, the moving party must demonstrate either (1) a probability of success on the merits and the possibility of irreparable injury, or (2) that serious legal questions are raised and the balance of hardships tips sharply in favor of the moving party. *See Lopez v. Heckler*, 713 F.2d

1432, 1435 (9th Cir.1983). These standards are not treated as separate tests by the Ninth Circuit, but rather as "the outer reaches 'of a single continuum.'" *Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1201 (9th Cir.1980). The critical element in determining which version of the test to apply is the relative hardship to the parties. "If the balance of harm tips decidedly towards the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Benda v. Grand Lodge*, 584 F.2d 308, 315 (9th Cir. 1978). Thus, it is sensible to divide this analysis into two sections, first addressing the merits of the legal claims, and then considering the balance of hardships to the parties.

### II. The Merits of the Plaintiffs' Claims

The plaintiffs' complaint contains three separate causes of action. First, they claim that the defendants are violating a federal statute governing the prepayment of mortgages held by HUD. Second, they contend that the Secretary of HUD abused his discretion by failing to consider and balance the purposes and policies of the National Housing Act and other applicable federal statutes. Finally, the plaintiffs maintain that the decision to sell the mortgages constitutes rule-making, and therefore should have been subject to notice and comment procedures, as well as publication in the Federal Register. Each of these causes of action is asserted under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, which provides a right of judicial review for any person affected or aggrieved by agency action. The defendants challenge the plaintiffs' standing to assert any of these claims, and they also attack the claims on their merits.

### A. Standing to Assert the Legal Claims

■ To satisfy the basic requirements for standing under Article III of the Constitution, a plaintiff must demonstrate the existence of three factors: (1) a threatened or actual distinct and palpable injury to the plaintiff, (2) a fairly traceable causal con-

nection between that injury and the challenged conduct of the defendant; and (3) a substantial likelihood that the relief requested will redress or prevent the injury. *See Olagues v. Russoniello,* 797 F.2d 1511, 1517 n. 7 (9th Cir.1986) (en banc); *see also Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). These requirements must also be met by each of the named plaintiffs in a class action. *See Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 n. 20 (1976); *Warth v. Seldin,* 422 U.S. 490, 502, 95 S.Ct. 2197, 2207, 45 L.Ed.2d 343 (1975).

In this case, the plaintiffs' complaint alleges that the following injuries will occur to the named plaintiffs and the class as a result of the mortgage sales: (1) all of the Regulatory Agreements will be terminated (Complaint ¶¶ 50(b), 57, 58(a)); (2) none of the projects will be eligible for further Section 8 Housing Assistance Payment ("HAP") contracts (Complaint ¶ 54); (3) tenants will no longer be afforded the protections of the Multifamily Mortgage Foreclosure Act ("MMFA"), 12 U.S.C. §§ 3701 *et seq.* (Complaint ¶ 58(b)); (4) tenants will no longer be afforded the protections of the Property Management and Disposition statute, 12 U.S.C. § 1701z–11 (Complaint ¶ 58(c)); and (5) statutory restrictions upon the prepayment of mortgages, *see* 12 U.S.C. § 1715z–15, will be eliminated (Complaint ¶ 58(d)).

The defendants contend that these alleged injuries are not sufficient to confer standing upon the plaintiffs. They argue that it is "sheer speculation" whether any of these changes will result in actual injury to any of the tenants. They point out that it is impossible to know for certain whether any of the projects would renew their Section 8 HAP contracts if they remained eligible, or whether any tenants would in fact benefit from the protections of the MMFA or the property disposition rules if there were no sale. Furthermore, the defendants also maintain that the plaintiffs are not the intended beneficiaries of the Regulatory Agreements, citing several cases holding that residents of multi-family housing projects lack standing to enforce such

agreements. *See Reimer v. West Village Associates,* 768 F.2d 31, 33–34 (2d Cir. 1985); *Falzarano v. United States,* 607 F.2d 506, 511 (1st Cir.1979).

■ The court finds the defendants' arguments to be without merit. Although it is true that Article III requires an injury that is not "abstract," "conjectural" or "hypothetical," *see Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984), the plaintiffs here have alleged actual and threatened injuries that are "distinct and palpable." The day the mortgage sales close, the terms and conditions under which all of the plaintiffs' housing projects are operated will change substantially. The most immediate injury will be the cancellation of the Regulatory Agreements, which will result in immediate elimination of various provisions including the reserve fund for repairs and limitations on security deposits and other charges to tenants. The defendants' reliance on *Reimer* and *Falzarano* in this context is simply misplaced. Those cases held only that there was no private right of action for tenants to enforce a Regulatory Agreement as third party beneficiaries; they did not address the question whether the cancellation of a Regulatory Agreement constitutes an injury sufficient to confer standing upon tenants. Because the terms of operation of the housing projects will change immediately after the mortgage sales, the court finds that the plaintiffs have demonstrated actual injury.

Furthermore, in addition to the cancellation of the Regulatory Agreements, the tenants here will immediately lose the protection of various statutes that apply only to mortgages held or insured by HUD. Although the plaintiffs cannot know in advance exactly which of them would actually benefit from these statutes, they are all potentially disadvantaged by the elimination of these legal protections. The Supreme Court has held that "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1148 n. 3,

35 L.Ed.2d 536 (1973), *quoted in Cutler v. Kennedy,* 475 F.Supp. 838, 848 (D.D.C. 1979). All that is required is that the plaintiff "demonstrate a realistic danger of sustaining a direct injury" as a result of the invasion of legal rights created by the statute. *See Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979). The plaintiffs here have demonstrated such a "realistic danger," and their allegations therefore satisfy the prerequisites of Article III. We now turn to the merits of the plaintiffs' legal claims.

*B. The Statutory Pre-Payment Limitations*

The plaintiffs contend that the sale of mortgages violates 12 U.S.C. § 1715z–15(a), which provides:

During any period in which an owner of a multifamily rental housing project is required to obtain the approval of the Secretary for prepayment of the mortgage, the Secretary shall not accept an offer to prepay the mortgage on such project unless—

(1) the Secretary has determined that such project is no longer meeting a need for rental housing for lower income families in the area or that the needs of lower income families in such project can more efficiently and effectively be met through other Federal housing assistance taking into account the remaining time the project could meet such needs;

(2) the Secretary (A) has determined that the tenants have been notified of the owner's request for approval of a prepayment; (B) has provided the tenants with an opportunity to comment on the owner's request; and (C) has taken such comments into consideration; and

(3) the Secretary has ensured that there is a plan for providing relocation assistance for adequate, comparable housing for any lower income tenant who will be displaced as a result of the prepayment and withdrawal of the project from the program.

The plaintiffs contend that the mortgage sales violate this statute for two main reasons. First, the plaintiffs note that five of the mortgages with prepayment restrictions were sold directly to the owners of the housing projects during the first phase of the sale, effectively resulting in prepayment of the mortgages without complying with the requirements of the statute. Second, by selling the remaining mortgages to third parties, the plaintiffs maintain that the Secretary will have created a situation in which project owners may subsequently prepay their mortgages without observing the requirements of the statute.

■ The court is not persuaded by these arguments. As the defendants point out, the express language of the statute makes it plain that Congress was concerned exclusively with mortgage prepayments that automatically result in the withdrawal of a housing project from a subsidy program. Subsection (a)(1) of the statute directs the Secretary to accept an offer of prepayment only if the project is no longer meeting the need for low-income rental housing in the area, or the need could be met more effectively through other federal housing programs. The clear implication of this language is that Congress contemplated that the existing subsidy program would terminate because of the mortgage prepayment. Subsection (a)(3) makes this even more clear by requiring the Secretary to provide a relocation assistance plan for tenants who are displaced "as a result of the prepayment *and withdrawal of the project from the program.*" (emphasis added). In this case, even assuming that the mortgage sales constitute prepayments, they would not result in "withdrawal of the project" from any housing subsidy program because HUD is not selling any mortgages for projects with subsidies that are dependent upon the continued existence of the mortgage. *See* Bourne Decl. ¶ 13. Thus, the plaintiffs have failed to establish a probability of success on this claim.[1]

---

**1.** The plaintiffs correctly point out that the statute is not expressly limited to mortgage prepayments that automatically result in the termi-

nation of a subsidy program. However, the language of the statute clearly reveals that this was the motivation behind its passage. Further-

Despite the fact that the plaintiffs have not established a probability of success on the merits of this claim, the court finds that they have raised a serious legal question. Although the court is inclined to accept the defendants' inferences from the language of the statute, there is ambiguity that leaves room for a different interpretation. As noted above, in the first phase of the mortgage sale, the owners of five housing projects with mortgage prepayment restrictions bought their own mortgages. Assuming the statute applies, the Secretary's acceptance of the project owners' bids is arguably violative of 12 U.S.C. § 1715z–15 in that the Secretary is "accepting an offer to prepay a mortgage" without complying with the requirements of the statute.

*C. Failure to Consider the Policies Underlying the National Housing Act*

The plaintiffs' second cause of action alleges that the Secretary of HUD abused his discretion by failing to consider and balance the requirements and goals of the National Housing Act in deciding to sell the mortgages. The plaintiffs do not dispute that the Secretary has the statutory authority to sell mortgages under 12 U.S.C. § 1713(k), which permits the Secretary "to exercise all the rights of a mortgagee under such mortgage, including the right to sell such mortgage." However, the plaintiffs do contend that the Secretary's decision to exercise this statutory authority was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" within the meaning of the APA, 5 U.S.C. § 706(2)(A).

The scope of judicial review over agency action under the "arbitrary and capricious" standard is a narrow one, and the court must not simply substitute its judgment for that of the agency. *See Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). A reviewing court must "consider whether the decision was based on a

consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers,* 463 U.S. at 43, 103 S.Ct. at 2866. Although the standard is deferential to agency expertise, it does not shield the Secretary's actions "from a thorough, probing, in-depth review." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

Several other courts have had occasion to address claims that the Secretary of HUD abused his discretion by ignoring the relevant policies underlying the National Housing Act. In *United States v. Winthrop Towers,* 628 F.2d 1028 (7th Cir.1980), the Seventh Circuit reversed a district court's ruling that HUD's decision to foreclose on a mortgage was "committed to agency discretion by law" and therefore unreviewable under the APA, 5 U.S.C. § 701. The court noted that the National Housing Act specifically requires HUD to exercise its powers, functions, and duties "consistently with the national housing policy declared by this Act...." 42 U.S.C. § 1441. Relying upon several prior district court decisions, the Seventh Circuit held: "This language compels our conclusion that HUD's decision to foreclose may be reviewed to determine whether it is consistent with national housing objectives." *Id.* at 1034–35 (citing *Kent Farm Co. v. Hills,* 417 F.Supp. 297 (D.D.C.1976); *United States v. American*

---

more, HUD has consistently adhered to this interpretation of the statute, *see* Bourne Decl. ¶ 13, and "considerable weight should be accorded to an executive department's construc-

tion of a statutory scheme it is entrusted to administer." *Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

*National Bank and Trust Co.*, 443 F.Supp. 167 (N.D.Ill.1977)).

The Ninth Circuit has also reached a similar conclusion. In *Russell v. Landrieu*, 621 F.2d 1037 (9th Cir.1980), former tenants of a low-income housing project sued to enjoin sale of the project after foreclosure by HUD. The Ninth Circuit held that the tenants had no due process entitlement to continued low-income housing. However, the court also stated:

> In exercising his discretion to dispose of HUD-acquired property, the Secretary must act, whenever possible, in a manner which is consistent with the objectives and priorities of the National Housing Act. Actions taken without consideration of these policies, or in unnecessary conflict with them, will not stand.... Liberally construed, the complaint alleges that the Secretary acted only to obtain maximum financial return for HUD and that he failed to consider and implement alternatives which would have enabled him to effect the policies and objectives of the National Housing Act. If true, these actions and omissions would constitute an abuse of the Secretary's discretion, and actions not in accordance with law. Judicial relief would be appropriate under the Administrative Procedure Act in such an instance.

*Id.* at 1041–42.

■ On the basis of these authorities, the court finds that the Secretary's decision to sell the mortgages in this case must be reviewed to determine whether the Secretary has acted, to the extent possible, in a manner which is consistent with the objectives and priorities of the National Housing Act. Although HUD enjoys broad discretion in choosing the means for achieving national housing objectives, *see United States v. OCCI Co.*, 758 F.2d 1160, 1162 (7th Cir.1985), the Secretary's actions must be invalidated if he acts only to obtain maximum financial return for HUD and he fails to consider and implement alternatives that would have enabled him to effect the objectives and priorities of the Act.

The defendants have submitted only one declaration setting forth the reasons behind the mortgage sales at issue here. In that declaration, Morris Bourne, the Director of the Office of Multifamily Housing Management at HUD, states:

> In connection with a Government-wide effort to sell loan assets, HUD's budget for Fiscal Year 1987 calls for the sale [of] mortgage notes. The loan assets sale program is designed to:
> a. reduce the Government's administrative costs by transferring servicing, collection, and other administrative activities to the purchaser;
> b. provide an incentive for agencies to improve loan origination and documentation;
> c. determine the actual subsidy of Federal credit programs; and
> d. increase budget collections in the year of sale.

Bourne Decl. ¶ 4.

In addition to the declaration of Morris Bourne, the defendants have also submitted, in response to a court order, copies of "all unprivileged documents relied upon or reviewed by anyone in the Department of Housing and Urban Development in Washington D.C. who was involved in the decision to sell the mortgages at issue in this case." Defendant's Response to Plaintiffs' Request for Production of Documents (filed June 26, 1987). These documents reveal that the government-wide policy of selling loan assets was orchestrated by OMB, which issued guidelines for the sales on July 8, 1986. These guidelines included a requirement that the loan asset sales be made "without future recourse to the Federal Government," including "any Federal guarantees of principal and interest payments."

The announced objectives of the government-wide loan assets sales program clearly reveal that the basic purpose behind the mortgage sales at issue here has nothing to do with achieving the objectives and priorities of the National Housing Act. OMB has stated that its primary goals are to reduce administrative costs, improve loan origination and documentation, determine the actual subsidy of federal credit programs, and increase budget collections.

These goals are not even remotely related to the objectives of national housing policy, which are set forth in 42 U.S.C. § 1441 as follows:

> The Congress declares that the general welfare and security of the Nation and the health and living standards of its people require housing production and related community development sufficient to remedy the serious housing shortage, the elimination of substandard and other inadequate housing through the clearance of slums and blighted areas, and the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family.

The United States Supreme Court has clearly held that agency action is "arbitrary and capricious" if "the agency has relied on factors which the Congress has not intended it to consider...." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). In *Farmworker Justice Fund, Inc. v. Brock,* 811 F.2d 613 (D.C.Cir.), *vacated as moot,* 817 F.2d 890 (D.C.Cir.1987),[2] the D.C. Circuit relied upon this general principle to hold that the Secretary of Labor had abused his discretion by citing federalism concerns in support of the decision not to issue field sanitation standards for agricultural workers. The court reasoned that federalism was not a permissible consideration under the relevant statute, and the Secretary was therefore not entitled to take it into account in his decision-making. *See id.* at 624–27. Similarly, in this case, the mortgage sales policy is motivated by concerns that are extraneous to the National Housing Act. Nothing in the Act suggests that Congress intended HUD to consider factors such as determining the subsidy of federal credit programs and increasing federal budget collections.

However, the mortgage sales program does not constitute an abuse of discretion simply because it is motivated by govern-ment-wide policy concerns extraneous to the National Housing Act. The court recognizes that an executive agency is entitled to take into account broad administration policies that are not in direct conflict with the applicable governing statute. *See Sierra Club v. Costle,* 657 F.2d 298, 404–06 (D.C.Cir.1981). However, when the administration policies motivating agency action are entirely independent of the policies underlying the applicable governing statute, a reviewing court must be especially vigilant in ascertaining whether the agency action is consistent with the statutory objectives. In such a situation, the court must focus particular attention on whether the agency as considered all "important aspect[s] of the problem," *Motor Vehicle Manufacturers,* 463 U.S. at 43, 103 S.Ct. at 2866, and has "consider[ed] and implement[ed] alternatives which would have enabled [it] to effect the policies and objectives of the [applicable statute]." *Russell v. Landrieu,* 621 F.2d 1037, 1042 (9th Cir.1980).

The plaintiffs call attention to a number of important legal effects of the mortgage sales policy that the Secretary has allegedly failed to consider. As the plaintiffs point out, the sales will cause tenants to lose substantial legal protections that are available only for mortgages held or insured by HUD. First, as noted above, the most immediate effect of the sales will be to cancel all applicable provisions of the Regulatory Agreements. Although some of these provisions will be preserved for the PMM's through the use of corrective deeds, corrective deeds will not be required for any of the assigned mortgages, which comprise the vast majority of the sale. Furthermore, significant provisions of the Regulatory Agreements will not be included in the corrective deeds for the PMM's, including the reserve fund for repairs and the limitations on security deposits and other tenant charges.

Second, project-based Section 8 HAP contracts are available only for HUD-insured projects or projects with assigned or pur-

---

**2.** The D.C. Circuit's *Farmworker* decision was vacated as moot by the three-judge panel because the Secretary of Labor issued field sanita- tion standards before the court's mandate was issued. Although the decision was vacated, this court finds its reasoning to be persuasive.

chase money mortgages held by HUD. *See* 24 C.F.R. § 886.101(a).[3] After the mortgage sales, the existing HAP contracts will remain in effect, *see* Bourne Decl. Exh. C (Request for Proposals at 19), but the projects with such contracts will not be eligible to renew them because HUD will no longer hold or insure their mortgages. Although HUD now claims to have a policy of offering Section 8 vouchers to individual tenants of projects with expired HAP contracts, *see id.* ¶ 8, there is no guarantee that the practice will remain in effect until the expiration of all the existing contracts. Furthermore, under the individual voucher program, there is no rent ceiling as there is under a project-based HAP contract. *See* Bourne Decl. ¶ 7. Finally, projects with Section 8 HAP contracts that do not cover all of the units will be precluded from expanding their Section 8 coverage, and projects without any current contract (which constitute the vast majority of the mortgage sales) will be precluded from establishing eligibility in the future.

Third, the sale of the mortgages will also deprive tenants of the protections of the Multifamily Mortgage Foreclosure Act ("MMFA"), 12 U.S.C. §§ 3701 *et seq.*, and the Property Management and Disposition statute, 12 U.S.C. § 1715z–11. The MMFA requires HUD, in certain circumstances, to impose as a condition of sale at a foreclosure the requirement that the purchaser operate the property in accordance with the terms of the applicable program and Regulatory Agreement in effect prior to the foreclosure. *See* 12 U.S.C. § 3706(b). · Because the mortgages at issue here are being sold without mortgage insurance, any future foreclosure will be initiated by the new mortgagor, and not by HUD. Thus, the protections of the MMFA will not apply

to any foreclosures after the mortgage sales.

Finally, the mortgage sales will also affect HUD's ability to monitor compliance with the Flexible Subsidy Program, 12 U.S.C. § 1715z–1a. Fourteen of the mortgages being offered for sale have received financial assistance under this program, in exchange for which they were required by HUD to execute a "Use Agreement" promising "to maintain the low- and moderate-income character of [the projects] for a period at least equal to the remaining term of the project mortgage." 12 U.S.C. § 1715z–1a(d)(1). By selling the mortgages and terminating the Regulatory Agreements, HUD will effectively abandon any further control over the project, relinquishing its ability to ensure that the objectives of the Flexible Subsidy Program are met. Although the Use Agreements will remain in effect, tenants will effectively be left to themselves to monitor compliance. *See* Bourne Decl. ¶ 9.[4]

As the plaintiffs point out, there is absolutely nothing in the record indicating that the Secretary considered these important aspects of the mortgage sales program. There are no declarations, affidavits, or documents setting forth the reasons for the Secretary's opinion that the mortgage sales program is consistent with the goals of national housing policy in spite of the effects pointed out by the plaintiffs. On this record, the only conclusion the court can draw is that the Secretary has simply implemented the terms and conditions of the loan assets sale policy promulgated by OMB, without stopping to consider whether the policy is in accord with HUD's statutory duty to further the goals of national housing policy. This constitutes an abdication of the Secretary's congressionally del-

---

3. Under the project-based Section 8 housing program, HUD or the local housing authority enters into a HAP contract with a project owner, which enables the owner to provide tenant subsidies to low-income tenants in all or a specified number of housing units. Under these contracts, HUD pays the difference between 30 percent of an eligible family's income and the rent for the residence. *See* Bourne Decl. ¶ 7.

4. The plaintiffs also contend that the mortgage sales will effectively result in elimination of the limitations on mortgage prepayments set forth in 12 U.S.C. § 1715z–15(a). Because the court is inclined to accept the defendants' argument that these statutory limitations are not applicable to the projects at issue here, we do not find this argument persuasive.

egated responsibility under the National Housing Act, and an abuse of discretion.

Furthermore, there is also nothing in the record before the court indicating whether the Secretary "consider[ed] and implement[ed] alternatives which would have enabled him to effect the policies and objectives of the National Housing Act." *Russell v. Landrieu*, 621 F.2d 1037, 1042 (9th Cir.1980). One such alternative might have been to request OMB to eliminate or modify its requirement that the mortgages be sold without insurance. This alternative was apparently considered at the suggestion of the investment community (which preferred to buy insured mortgages) in connection with a previous sale of mortgages. *See* November 29, 1984 Memorandum from Audrey Hinton at 2–3 (filed June 26, 1987). The record does not reflect whether that possibility was pursued; however, a July 8, 1986 memorandum from OMB indicates that requests for changes in the OMB guidelines might have been entertained. *See* July 8, 1986 Memorandum from Joseph R. Wright (filed June 26, 1987) ("[I]f you run into serious problems with any of the guidelines, please let me know promptly. The guidelines should be met whenever possible; as we gain experience, we may need to make revisions.").

Another alternative that might have been considered in order to minimize the effects noted by the plaintiffs would have been to require corrective deeds for the assigned mortgages, as well as the PMM's. Again, nothing in the record reflects the Secretary's reasons for deciding to require corrective deeds only for the PMM's, except that the Sale Announcement states that some of the Regulatory Agreement provisions for the PMM's "have a statutory basis." Bourne Decl. Exh. B at 2. Even if there is no statutory basis for the Regulatory Agreement provisions of the assigned mortgages, however, that in itself does not justify their abandonment. In order to proceed with the cancellation of these Regulatory Agreements, the Secretary must demonstrate that he has considered whether their cancellation is consistent with the policies of the National Housing Act, or whether there are alternatives that are consistent with the policies of the National Housing Act. Nothing in the record reveals that the Secretary has undertaken such an analysis.

There is obviously nothing in the National Housing Act or the APA that requires the Secretary of HUD to consider or implement any particular alternative to contemplated agency action. In this case, however, the record is bare of any evidence that the Secretary took into account important effects of the mortgage sales policy, or that he considered any alternatives to the program that might have been more consistent with the policies of the National Housing Act. Instead, the record suggests that the Secretary blindly adhered to the guidelines established by OMB for the loan assets sales policy, the purposes of which were unrelated to the achievement of national housing policy.

In sum, the court finds that the plaintiffs have demonstrated a high probability of success on the merits of their claim that the Secretary of HUD abused his discretion in deciding to proceed with the mortgage sales at issue here. The Secretary acted in conformity with uniform executive policies that are totally unrelated to the objectives of the National Housing Act, such as the maximization of financial return to the federal government. Nothing in the record reveals the basis for OMB's decision to prohibit mortgage insurance or HUD's decision to adhere to OMB policy. Finally, the record does not reflect that the Secretary took into consideration all important aspects of the problem, or that he considered alternatives that would have enabled him to effect the policies underlying the Act.

### D. Rule-Making Without Notice, Comment and Publication

The plaintiffs' final claim for relief asserts that HUD has violated the notice and comment procedures of the APA, 5 U.S.C. § 553, the Freedom of Information Act, 5 U.S.C. § 552(a)(1)(D), and HUD's own rule-making regulations, *see* 24 C.F.R. §§ 10.1–10.20 (1986). These statutes and regula-

tions provide that when an agency promulgates rules other than "interpretative rules, general statements of policy, or rules of agency organization, procedure or practice," 5 U.S.C. § 553(b)(A), the public must be provided with pre-promulgation notice and opportunity for comment, and the proposed rules must be published in the Federal Register. The APA defines the kinds of rules subject to these procedures as follows:

"rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency ...

5 U.S.C. § 551(4).

The Ninth Circuit has elaborated at some length on this basic definition of a "rule." The court has held that substantive rules are rules that "create law." *Vance v. Hegstrom*, 793 F.2d 1018, 1022 (9th Cir.1986). They "usually implement existing law, imposing general, extrastatutory obligations pursuant to authority properly delegated by Congress." *Southern California Edison Co. v. FERC*, 770 F.2d 779, 783 (9th Cir.1985). Substantive rules "effect a change in existing law or policy and affect individual rights and obligations." *Id.* (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03, 99 S.Ct. 1705, 1718, 60 L.Ed.2d 208 (1979)). The D.C. Circuit has also defined substantive rules as rules that "implement congressional intent" and "effectuate statutory purposes." "In so doing, they grant rights, impose obligations, or produce other significant effects on private interests." *Batterton v. Marshall*, 648 F.2d 694, 701–02 (D.C.Cir.1980). "Interpretative rules," on the other hand, have been defined by the courts as rules that "clarify and explain existing law and regulations." *Vance*, 793 F.2d at 1023. They "merely express[ ] an agency's interpretation, policy, or internal practice or procedure." *Batterton*, 648 F.2d at 702.

■ Based on the language of the statute, the court finds that the policy decision to sell mortgages on the terms and condi-

tions set forth in the May 1, 1987 Sale Announcement qualifies as a "rule." The Sale Announcement and Request for Proposals constitutes "the whole or a part of an agency statement." The statement has general or particular applicability and future effect, and is designed to implement the government-wide policy of selling loan assets. Furthermore, the policy also qualifies as a "substantive rule" under the applicable Ninth Circuit precedents. The policy creates law by establishing the terms and conditions of the mortgages sales, and changing the terms and conditions under which the housing projects will operate in the future. The policy implements existing law by putting into effect HUD's statutory authority to sell mortgages under 12 U.S.C. § 1713(k). The mortgage sales also effect a change in existing law or policy and affect the individual rights and obligations of tenants and owners of multi-family housing projects. Thus, the court concludes that the plaintiffs have demonstrated a probability of success on their claim that the mortgage sales policy is a "substantive rule" that should have been subject to notice and comment procedures and publication in the Federal Register.

It is also of significance that the mortgages at issue here are being sold without insurance because of an OMB directive prohibiting HUD from selling mortgages with insurance. This directive was issued by OMB on February 16, 1984, and has been followed by HUD ever since. Applying the legal standards set forth above, the court finds that the OMB directive itself constitutes a "substantive rule" subject to APA notice and comment procedures and publication requirements. Because HUD is acting pursuant to a policy promulgated by OMB in violation of the relevant provisions of the APA, the plaintiffs have demonstrated a probability of success on the merits of this claim.

The court notes that this result is consistent with the purposes behind these procedural requirements. The public notice and comment requirement:

creates a pre-publication dialogue which allows the agency to educate itself on the

full range of interests the rule affects, ... and reintroduces a representative public voice, thus ensuring 'fairness to affected parties after governmental authority has been delegated to unrepresented agencies,' ... through sensitive, efficient government decision making.

*Alcaraz v. Block,* 746 F.2d 593, 613 (9th Cir.1984) (citations omitted). Clearly, in order to ensure input from "the full range of interests" affected by the mortgage sales, the process would have benefited from participation by the tenants and owners of housing projects, as well as other members of the general public.

### III. The Balance of Hardships

The second factor to be analyzed in determining whether to grant a preliminary injunction is the possibility of irreparable injury and the balance of hardships to the parties. The discussion above demonstrates that the plaintiffs in this case will suffer immediate injury on the day that the mortgage sales close because they will automatically be deprived of numerous legal protections available only for projects with mortgages that are held or insured by HUD. Although the tenants may not suffer any tangible harm as a result of the sales until sometime in the indefinite future, the deprivation of legal rights is itself a harm cognizable in federal court. Furthermore, in order to prevent irreparable tangible harm from occurring in the indefinite future, the tenants must seek legal redress now because after the mortgage sales close it will be difficult, if not impossible, for the tenants to regain their legal rights by compelling a reconveyance of the mortgages from the purchasers to HUD. Thus, the court finds that the plaintiffs have demonstrated a possibility of irreparable injury.

■ Despite the immediate and irreparable loss of legal rights to the plaintiffs resulting from the mortgage sales, the defendants argue that the balance of hardships favors them because a preliminary injunction would prevent the Secretary from carrying out his lawful duties and prevent HUD from meeting its budgetary goal for the current fiscal year. However,

the court has found that the plaintiffs have demonstrated a probability of success on their claims that the Secretary is not in fact "carrying out his lawful duties." Furthermore, HUD's abilities to meet its budgetary goals for the current fiscal year do not carry substantial weight with the court. A preliminary injunction would only prohibit the sale of mortgages during the pendency of this action. Thus, if HUD ultimately prevails on the merits, the mortgage sales will simply take place in another fiscal year. For this reason, the court finds that the balance of hardships tips decidedly in the plaintiffs' favor.

### CONCLUSION

Under either of the two standards for preliminary injunctive relief, the court finds that the preliminary injunction must be granted. The plaintiffs have raised serious legal questions on the merits of their first claim, and have demonstrated a probability of success on the merits of the other two claims. They have shown the possibility of irreparable injury, and the balance of hardships tips decidedly in their favor. Class-wide injunctive relief is appropriate because the court has certified a nationwide class of present and future tenants of the affected projects. Thus, the plaintiffs' application for a preliminary injunction is granted, and the defendants are hereby enjoined from undertaking any of the actions specified in the introduction to this order during the pendency of the litigation.

Rule 65(c) of the Federal Rules of Civil Procedure requires "the giving of security by the applicant, in such sum as the court deems proper," before a preliminary injunction will issue. However, "[u]nder appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c)." *Wayne Chemical, Inc. v. Columbus Agency Service Corp.,* 567 F.2d 692, 701 (7th Cir.1977). The court has the discretion to dispense with the security requirement where giving security would effectively deny access to judicial review, *see People ex rel. Van De Kamp v. Tahoe Regional Plan,* 766 F.2d 1319, 1325 (9th Cir.1985), or where suit is brought on be-

half of a class of poor persons, *see Orantes-Hernandez v. Smith,* 541 F.Supp. 351, 385 n. 42 (C.D.Cal.1982); *Toussaint v. Rushen,* 553 F.Supp. 1365, 1383 (N.D.Cal. 1983), *aff'd in part, vacated in part,* 722 F.2d 1490 (9th Cir.1984). Because this case is brought by indigent class representatives on behalf of mostly indigent tenants, the court in its discretion waives the requirement of security.

IT IS SO ORDERED.