**SAN ANTONIO GENERAL MAINTENANCE, INC., et al., Plaintiffs,**

v.

**James ABNOR, et al., Defendants.**

**Civ. A. No. 87–1861.**

United States District Court, District of Columbia.

Nov. 16, 1987.

David W. James, James A. Kahl, Lewis, Kominers & James, Washington, D.C., Donald E. Barnhill, East, Barnhill & Gremillion, San Antonio, Tex., for plaintiffs.

Daniel Bensinger, Asst. U.S. Atty., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Most litigation involving federal programs produces predictable arguments on

both sides: the government attempts to withdraw benefits and the individual asserts continued eligibility and entitlement. This case, however, presents an interesting twist on that familiar scenario. Plaintiffs San Antonio General Maintenance, Inc. (SAGM) and Pedro G. Molina, Jr., brought this action for declaratory and injunctive relief against defendants James Abnor, Administrator of the Small Business Administration (SBA), and Edward C. Aldridge, Jr., Secretary of the Air Force. SAGM, which currently holds a contract to provide custodial services at Kelly Air Force Base in San Antonio, Texas, seeks to require defendants to permit competitive bidding on their next awarding of the contract; the SBA and the Air Force, however, have determined to retain the contract under a special program for socially and economically disadvantaged small business concerns. Simultaneously with the filing of its complaint, SAGM moved for a temporary restraining order and for a preliminary injunction, and defendants responded with a motion to dismiss or, in the alternative, for summary judgment. These matters were considered at a final hearing held in September 1987. For the reasons set forth below, plaintiffs' requests for injunctive and declaratory relief will be denied and defendants' motion for summary judgment will be granted.

## I. *Background*

Section 2[8](a) of the Small Business Act of 1958, 15 U.S.C. § 637(a), established a special program designed to benefit "socially and economically disadvantaged" small business concerns.[1] In order to "foster business ownership" and "promote the competitive viability" of these firms, 15 U.S.C. § 631(e)(2), the Act authorizes the SBA to enter into procurement and construction contracts with any federal agency. The SBA then subcontracts with qualifying small businesses, which actually provide the services directly to the federal agency. *See* 15 U.S.C. § 637(a)(1). Contracts designated for the 2[8](a) program are therefore effectively withdrawn from the customary competitive bidding procedures generally applicable to federal procurements.

Participation in the 2[8](a) program is not eternal, however. Mindful that "these contracts be a means to fostering competitive viability ... and not an end in themselves," S.Rep. No. 974, 96th Cong., 2d Sess. 3 (1980), U.S.Code Cong. & Admin.News 1980, pp. 4953, 4954, Congress amended the Act in 1980 and directed the SBA to establish a fixed period of time within which each 2[8](a) participant could remain within the program. *See* 15 U.S.C. § 636(j)(10)(A)(i). After reaching the end of its fixed term the disadvantaged concern is "graduated" from the 2[8](a) program and expected to compete for government contracts on an equal footing with other non-disadvantaged firms.

Plaintiff SAGM, a Texas corporation, and its president, plaintiff Pedro Molina, Jr., were accepted into the 2[8](a) program in 1976 and 1972, respectively, and were graduated in June 1985. In 1984, however, SBA awarded SAGM a one-year 2[8](a) contract, with two one-year extensions, to provide custodial services at the Kelly Air Force Base in San Antonio, Texas. Having graduated from the 2[8](a) program and with its contract due to expire on September 30, 1987,[2] SAGM initiated discussions with SBA representatives in early 1987 in order to assure that SAGM would be permitted to bid on the Kelly contract when it was released into the competitive procurement process. In June 1987, however, the SBA and the Air Force decided that the Kelly contract would remain within the 2[8](a) program and be awarded to another disadvantaged small business, Rite–Way

---

1. The Act defines these concerns by means of a numerical formula, *see* 15 U.S.C. § 637(a)(4), and specifically identifies certain minorities—such as blacks, Hispanics and Indians—that qualify for the program. *Id.* §§ 631(e)(1)(C) and 637(a)(5) & (6).

2. Counsel for defendants informed the Court at the final hearing that the contract has been extended for an additional two months and will now expire on November 30, 1987. Tr. 20–22.

Services, Inc.[3]

SAGM filed this action on July 9, 1987.[4] In its complaint, it contends that the SBA maintained a general policy and practice allowing a graduating 2[8](a) firm to competitively bid on the next contract awarded for the same services after the 2[8](a) participant's fixed term had expired. Plaintiffs claim that the SBA's actions (1) violated the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*, because the agency arbitrarily departed from its established practices without prior notice or an adequate explanation; and (2) contravened several SBA regulations governing the 2[8](a) procurement program.[5] In addition, the complaint asserts that the Air Force did not comply with Section 1207 of the National Defense Authorization Act of 1987, Pub.L. No. 99–661, 100 Stat. 3816, 3973–74, and its implementing regulations, by failing to synopsize and set-aside the Kelly contract for exclusive small disadvantaged business participation.[6] As relief, SAGM seeks (1) a preliminary and permanent injunction restraining defendants from awarding the Kelly contract to an 2[8](a) subcontractor and from denying SAGM the opportunity to bid competitively on it; (2) a declaratory judgment declaring that defendants' actions violated applicable laws and regulations; and (3) costs and attorney's fees.[7]

Defendants have countered with a motion to dismiss or, in the alternative, for summary judgment. They first assert that, under the rationale announced in *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct.

1649, 84 L.Ed.2d 714 (1985), the decisions of the SBA and the Air Force are committed to agency discretion and therefore unreviewable under section 701(a)(2) of the Administrative Procedure Act. Defendants also argue that this Court is precluded from issuing injunctive relief against the SBA because of an anti-injunction statute, 15 U.S.C. § 634(b)(1). On the merits, defendants assert that the SBA's general practice is embodied in the agency's Standard Operating Procedure (SOP) 80–05, not the regulations cited by plaintiffs. They contend that under SOP 80–05 the SBA's general policy is to retain 2[8](a) contracts whenever possible within the program; that, in selected instances, the agency can release such contracts for competitive bids; and that the SBA properly considered the factors set forth in SOP 80–05 in deciding that the Kelly custodial contract should be awarded once again on an 2[8](a) basis. Finally, defendants assert that section 1207 provides the Air Force with broad discretion—which the Secretary properly exercised—to determine whether to utilize 2[8](a) participants or other small businesses in meeting its set-aside goal under the statute.

## II.  *Threshold Issues*

### A.  Committed to Agency Discretion

■ The provisions of the Administrative Procedure Act do not apply "to the extent that ... agency action is committed to agency discretion by law." 5 U.S.C.

---

**3.** By Order dated July 14, 1987, the Court directed that defendants notify Rite–Way of the pendency of this litigation. Rite–Way was informed on July 20, 1987, *see* Motion to Dismiss, Exhibit E, but has not sought intervention to this time.

**4.** SAGM originally brought this case in the Western District of Texas but voluntarily dismissed that action without prejudice shortly thereafter. *See* July 22, 1987, Notice of Filing.

**5.** The complaint also alleges that the SBA violated SAGM's due process rights and the equal protection guarantees contained in 42 U.S.C. § 1985. Complaint ¶¶ 16–17. With the exception of a few pages in their Memorandum in Support of the Motions for A Temporary Restraining Order and Preliminary Injunction, plaintiffs have failed to address these issues in their later pleading or at the final hearing on

the merits. It is therefore assumed that they no longer intend to pursue these claims. In any event, given the Court's conclusion that SBA had no general policy of permitting 2[8](a) firms to compete for "graduated" contracts, *see infra,* these claims are legally insufficient as well.

**6.** Section 1207 is codified at 10 U.S.C. § 2301 note.

**7.** Simultaneously with the filing of its complaint, SAGM also moved for a temporary restraining order. After a status conference with the parties, the Court ordered that this motion be consolidated with the request for a preliminary injunction at the final hearing on the merits. *See* July 14, 1987, Order.

§ 701(a)(2). Defendants' argument for invoking this exception proceeds along the following deductive lines. The major premise is based on the Supreme Court's decision in *Heckler v. Chaney*, where the Court declared that section 701(a)(2) applies "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." 105 S.Ct. at 1655. The minor premise of defendants' argument is the plain language of the governing statutes (15 U.S.C. § 637 and section 1207), which defendants contend fails to provide any standards to guide the SBA in exercising its authority to award 2[8](a) contracts and the Air Force in reaching its contracting goal for hiring small disadvantaged businesses. Thus, they conclude that *Chaney* applies with equal force to this case, effectively insulating these decisions from judicial review under the APA.

Defendants' *Chaney* syllogism, while deceptively simple in its logic, is legally flawed in a number of important respects. First, the major premise is valid as far as it goes but ignores the *reasons* supporting the Court's conclusion of unreviewability. In holding that the Food and Drug Administration's decision to institute enforcement proceedings was presumptively unreviewable under section 701(a)(2), the Court stressed three factors: (1) administrative concerns with allocating scarce agency resources; (2) the similarity between the enforcement proceeding and the prosecutor's indictment decision; and (3) the fact that refusals to act do not involve coercive power by the agency over the individual. *Id.* at 1656. Defendants have completely failed to demonstrate—and the Court cannot discern—any resemblance between a decision not to commence enforcement proceedings

and the defendants' decision not to remove the Kelly contract from the 2[8](a) program. In light of the narrow holding in *Chaney*,[8] the Court cannot conclude, based on defendants' assertions, that the usually strong presumption in favor of judicial review does not apply in this case. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967); *see also American Horse Protection Ass'n v. Lyng*, 812 F.2d 1, 4 (D.C. Cir.1987) (refusing to apply *Chaney* to agency's decision not to institute a rulemaking proceeding); *Farmworker Justice Fund, Inc. v. Brock*, 811 F.2d 613 (D.C.Cir. 1987) (decision not to promulgate rule reviewable to determine whether agency head relied on permissible grounds in reaching decision), *vacated as moot*, 817 F.2d 890 (D.C.Cir.1987).

Defendants' minor premise is similarly unacceptable. In *Robbins v. Reagan*, 780 F.2d 37 (D.C.Cir.1985), our court of appeals examined the sources of "law" from which a court could draw standards to review agency action. In the absence of clear statutory guidelines, a court can attempt to (1) "discern from the statutory scheme a congressional intention to pursue a general goal"; and (2) examine "the promulgation of regulations or announcement of policies" to detect departures from the agency's stated position. *Id.* at 45.[9] Each of these sources exist in abundant supply in this case. First, the SBA Act itself sets forth specific goals for the 2[8](a) program, *see* 15 U.S.C. § 631(e)(2), and section 1207 also contains guidance for the Air Force in administering the SDB program. *See* § 1207(a) and (e). Plaintiffs claim that these goals are being subverted by defendants' failure to allow it to bid competitively

**8.** *See* 105 S.Ct. at 1651 ("This case presents the question of the extent to which a decision of an administrative agency to exercise its 'discretion' not to undertake certain enforcement actions is subject to review...."); *id.* at 1659 ("We therefore conclude that the presumption that agency decisions not to institute proceedings are unreviewable under § 701(a)(2) of the APA is not overcome by the enforcement provisions of the FDCA").

**9.** Defendants' reliance on *Lorian v. NRC*, 785 F.2d 1038 (D.C.Cir.1986), for the proposition that the mere existence of administrative regulations is not sufficient to overcome the *Chaney* presumption of unreviewability is misplaced. The *Lorian* court expressed no sentiments on this issue, *see id.* at 1041 ("the court need not plumb the intricacies of this reviewability conundrum"), and, in any event, that case raised enforcement concerns that are almost identical to *Chaney* and, as noted above, quite different from the issues presented here.

on the Kelly contract and defendants have offered no reason, nor can one be perceived, why these goals should not apply to a decision to enter into or discontinue 2[8](a) contracts. Moreover, the SBA, through SOP 80–05, and the Air Force, through its interim regulations and the Taft Memorandum, have stated their general policies with respect to the contracting decisions challenged by SAGM. By defendants' own admission, therefore, the Court has ample material from which to discern a departure from those policies. *See Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 40–44, 103 S.Ct. 2856, 2865–67, 77 L.Ed.2d 443 (1983). With their major and minor premises in disarray, defendants' ultimate conclusion—that the actions complained of in the complaint are unreviewable—must also fall.

B. Availability of Injunctive Relief Against the SBA

Section 2[5](b)(1) of the Act, 15 U.S.C. § 634(b)(1), provides that "no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Administrator or his property." Citing *Expedient Services, Inc. v. Weaver*, 614 F.2d 56 (5th Cir.1980), *Mar v. Kleppe*, 520 F.2d 867 (10th Cir.1975), and other cases, defendants contend that the injunctive relief sought by SAGM may not be awarded against the SBA. Plaintiffs have cited other authority—including a decision of the court of appeals in *Valley Forge Flag Co. v. Kleppe*, 506 F.2d 243 (D.C.Cir. 1974)—that appears to allow injunctive relief when the agency acts in excess of its statutory authority. It is unnecessary, however, to decide the interesting question of whether, and to what extent, section 634(b)(1) bars injunctive relief in this case because no comparable bar to injunctive relief exists with respect to the Air Force. Should this Court find in favor of plaintiffs on the merits, an injunction preventing the Air Force from entering into an 2[8](a) contract with SBA for the Kelly custodial services would, of course, preclude SBA

from maintaining this procurement within the program.[10] Because the Court could, therefore, grant plaintiffs complete relief without having to enjoin the SBA, it need not volunteer an advisory opinion on the propriety of awarding injunctive relief against the SBA in this instance.

III. *Standards of Review*

A. Injunctive Relief

The standards governing the issuance of injunctive relief are by now confortably familiar. The decision to grant or deny injunctive relief is quintessentially a discretionary act for the trial court, *see Lemon v. Kurtzman*, 411 U.S. 192, 200–01, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973), and usually involves balancing, on a case-by-case basis, the harm to the plaintiff if the injunction is denied with the harm to the defendant if it is granted. *Hecht Co. v. Bowles*, 321 U.S. 321, 329–330, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944). Injunctive relief remains, however, an extraordinary and drastic remedy, not to be routinely granted and to only lie when the right to relief is clearly established. *See, e.g., Ced's Inc. v. EPA*, 745 F.2d 1092, 1100 (7th Cir.1984) ("One of the requirements for a permanent injunction is that the plaintiff must have succeeded on the merits of its claim"), *cert. denied*, 471 U.S. 1015, 105 S.Ct. 2017, 85 L.Ed.2d 299 (1985). After establishing his right to relief, a plaintiff seeking an injunction must show that he has suffered irreparable injury and that the remedies available to him at law are inadequate. *See Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982).

B. Summary Judgment

A district court may grant a motion for summary judgment only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202

---

**10.** Defendants admit as much when they state that "both agencies had to agree for a contract

to be filled through 8(a)." Memorandum in Support of Motion to Dismiss at 3 n. 3.

(1986), the Supreme Court delineated two inquiries that a district court must undertake before granting summary judgment. First, the movant must show that there is no disagreement as to a *material* fact, which the Court described as one "that might affect the outcome of the suit under the governing law." In addition, summary judgment is appropriate only if the dispute is not *genuine.* In this regard, the trial judge should not "weigh the evidence and determine the truth of the matter" but rather perform "the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* 106 S.Ct. at 2511. Finally, the Court pointed out that "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 2513.

### C. Arbitrary and Capricious Action

■ The gravamen of SAGM's complaint is that defendants' decision to retain the Kelly contract within the 2[8](a) program constituted an unexplained and unjustified departure from usual agency policy and applicable regulations that SAGM asserts allow graduating firms to competitively bid in these circumstances. Review of such claims is governed by section 706(2)(A) of the APA, which empowers a court to "hold unlawful and set aside agency actions, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This power to review agency action is a limited one, however. The Supreme Court has stressed that

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."

*State Farm,* 463 U.S. at 43, 103 S.Ct. at 2866 (*quoting Burlington Truck Lines,*

*Inc. v. United States,* 371 U.S. 156, 169, 83 S.Ct. 239, 246, 91 L.Ed.2d 207 (1962)). So long as the agency decision "was based on a consideration of the relevant factors," *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971), the reviewing court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). And it almost goes without saying that plaintiffs carry the burden of demonstrating the arbitrary and capricious nature of the agency action under attack. *See, e.g., Mazleski v. Treusdell,* 562 F.2d 701, 717 n. 38 (D.C.Cir.1977).

■ Judicial scrutiny of government procurement decisions is similarly circumscribed. In *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289 (D.C.Cir.1971), Judge Leventhal observed that:

> [i]n the field of government procurement the courts must be sedulous to heed the admonition that their authority to vacate and enjoin action that is illegal must be exercised with restraint less the courts fall into the error of supposing that they may revise "action simply because [they] happen to think it ill-considered, or to represent the less appealing alternative solution available."

*Id.* at 1298–99 (*quoting Calcutta East Coast v. Federal Maritime Comm'n,* 399 F.2d 994, 997 (D.C.Cir.1968)). The *Steinthal* court also observed that "[i]f the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Id.* at 1301. Courts considering challenges to actions taken under the 2[8](a) program have employed a similar standard, *see, e.g., Little v. United States,* 489 F.Supp. 1012, 1017–18 (C.D.Ill.1980), *aff'd,* 645 F.2d 77 (7th Cir.1981); *Kinnett Dairies, Inc. v. Farrow,* 580 F.2d 1260, 1271–72 (5th Cir.

1978), clearly applicable here.[11] With this guidance in mind, the merits of this dispute are considered.

## IV. *The Merits*

### A. SBA Decision

Before considering whether the SBA's decision to award the Kelly contract to Rite–Way was an arbitrary and carpricious departure from existing agency policy regulations, the Court must resolve issues strenuously disputed by the parties: exactly what *was* the existing agency policy and what *are* the regulations that govern this action?

Plaintiffs contend that SBA's decision to retain the Kelly contract within the 2[8](a) program violated three agency regulations applicable to this case. The complaint first alleges that the SBA's actions contravened 13 C.F.R. § 124.301(b)(8)(iii) and (b)(8)(iv)(B), which required the SBA to make a number of findings with respect to the adverse impact upon SAGM before retaining the contract within the 2[8](a) program. The plain language of these regulations, however, demonstrates the futility of plaintiffs' reliance upon them. Section 124.301(b)(8) states: "SBA will not accept for 8(a) award *proposed procurements not previously in the section 8(a) program* if any of the following circumstances exist ..." (emphasis added). The highlighted language clearly indicates that these regulations are designed to serve as guidance to SBA officials considering the addition of *new* contracts to the 2[8](a) program; the regulation nowhere mentions graduation from the program or the fixed program

participation term.[12] These regulations do not, therefore, apply to this case.[13]

Plaintiffs also claim that the SBA failed to comply with 13 C.F.R. § 301(c)(4)(xi), which requires that the SBA obtain a statement from the procuring agency (the Air Force) that the proposed 2[8](a) contract would not be won by a disadvantaged concern under normal competition. Although section 124.301(c)(4) is not expressly limited to new procurements (as with section 124.-301(b)(8)), it also does not mention whether or how it applies to graduating firms.[14] Moreover, the unrebutted testimony of Albert Carter established that the finding with respect to normal competition is only required for "a new offering into the 8(a) program." Carter Dep. at 78. It is not established that this regulation applies to the instant case.

SAGM also vigorously asserts that the SBA's "past policy and practice" permitted graduating 2[8](a) firms to bid competitively on the next contract to be awarded for the same services once the 2[8](a) participant's eligibility for the program had expired, Complaint ¶ 11, and, to support its view, offers two pieces of evidence: (1) plaintiff Molina's assertion that, at a February 26, 1987, meeting in San Antonio, he was informed by two local SBA officials that SBA policy "had always been" to allow graduating firms to bid competitively on the 2[8](a) contracts that they had just relinquished, *see* Molina Affidavit at 4–5; and (2) the fact that six former 2[8](a) contractors have indicated that their contracts were competitively bid after completion of their program eligibility. Fiorino

---

**11.** The parties do not dispute the standards applicable to this action. *See* Plaintiffs' Opposition at 19.

**12.** The drafters of the 2[8](a) regulations knew how to use these terms when they wanted to. *See, e.g.,* 13 C.F.R. §§ 124.110 and 124.111.

**13.** Perhaps realizing the facial infirmities in their argument, plaintiffs rely on answers to several interrogatory questions in which defendants stated that 13 C.F.R. § 301(b)(8) applied to a graduating 2[8](a) firm. Opposition at 3–4. Defendants later noted that their response to these interrogatories was in error and amended

those answers accordingly. *See* Tr. 22–23; 38–39. In addition, plaintiffs' selective citation to the testimony of Albert Carter overlooks the fact that Carter later expressly denied that section 124.301(b)(8) applied to graduating firms. *Compare* Carter Dep. at 55–57 *with id.* at 62.

**14.** One could, from the face of the regulation, conclude that it was also intended to apply only to *new* procurements. Section 124.301(c)(1) speaks of "screen[ing] proposed procurements for possible 8(a) contracts" and section 124.-301(c)(4) imposes requirements in order "[t]o facilitate matching."

Affidavit, Exh. P–3 to Plaintiffs' Supplemental Filing at 4–6.

Defendants steadfastly oppose this view. First, they assert that the SBA prefers to keep contracts within the 2[8](a) program whenever possible, thus preventing a graduating 2[8](a) firm from "taking his contract" with him after graduation. Memorandum in Support of Motion to Dismiss at 14; Luna Dep. at 30–31. In certain selected instances, however, the SBA does allow 2[8](a) contracts to be released for competitive bids on a case-by-case basis in accordance with the factors set forth in paragraph 46(e) of SOP 80–05.[15] Thus, defendants contend that paragraph 46(e) constitutes the agency policy governing graduating firms. Second, defendants contest plaintiffs' factual claims regarding the former 2[8](a) firms that were allowed to bid after expiration of their program eligibility. See Luna Declaration, Exh. G to Memorandum in Support of Motion to Dismiss.

Scrutiny of this matter leads to the conclusion that SBA's policy with respect to graduating firms is contained in paragraph 46(e) of SOP 80–05. Plaintiffs' reliance on the February 26, 1987, San Antonio meeting is inappropriate for several reasons. First, the statements by the local San Antonio officials were, as plaintiffs readily admit (Molina Affidavit ¶¶ 19–21), flatly disavowed by several SBA regional and headquarters officials within a few days of the San Antonio meeting. Moreover, the very reason that SAGM sought the San Antonio meeting—because it learned that another 2[8](a) firm had been denied a competitive bidding opportunity (id. ¶ 13)—flies directly in the face of plaintiffs' assertion of a general policy *permitting* such opportunities. Lastly, plaintiff Molina's version of the meeting differs substantially from that of Julio Perez, one of the local officials present at the San Antonio meeting.[16] Mr. Perez' testimony indicates that, at best, he *believed* that a policy of competitive bidding on graduating 2[8](a) contracts *may* have been an agency practice at *some* point in the past. See Perez Dep. at 12–14. In short, the circumstances surrounding the San Antonio meeting fail to demonstrate a general SBA policy. In addition, the fact that six 2[8](a) contractors were allowed to bid competitively on contracts after graduation does not demonstrate a generally applicable across-the-board policy. Even accepting plaintiffs' version of the facts, only six of 42 graduates were allowed to competitively bid. See Tr. 4–6. That statistic, if anything, bolsters *defendants'* claim of a case-by-case determination.[17]

In conclusion, plaintiffs have failed to demonstrate a general and affirmative SBA policy allowing graduating firms to engage in competitive bidding after their 2[8](a) term had expired, and, therefore, any claims that the SBA departed from its prior policy without explanation are meritless. The Court will, therefore, examine the arbitrariness of the SBA's actions against the backdrop of paragraph 46(e) of SOP 80–05(e).

Paragraph 46(e) provides:

In selected instances SBA may determine that contracts being performed by 8(a) concerns that will have completed the 8(a) program prior to contract completion

---

**15.** The full text of paragraph 46(e) is set forth *infra.*

**16.** By Order dated August 4, 1987, at a time of expedited discovery in order to have this matter determined at an early, and prioritized time on the calendar for benefit of the parties, and plaintiffs in particular, Judge Parker limited discovery to Mr. Perez's deposition, but did not allow the deposition of the other local official present at the meeting.

**17.** The Court would note, parenthetically, that defendants' evidence that the policy of the SBA generally was *not* to allow graduating firms to bid is less than overwhelming. It is undisputed that paragraph 46(e) of SOP 80–05 did not become effective until April 27, 1987, and that the decision to retain the Kelly contract within the 2[8](a) program was made before that date. See Memorandum in Support of Motion to Dismiss at 18 n. 8. The memorandum of Mr. Luna documenting this decision was clearly based, however, on the factors contained in paragraph 46(e). See id. Exh. B. Because they do not contest this point in any way, see Opposition at 8–12, plaintiffs have failed to offer "affirmative evidence" that would defeat defendants' claim. *Anderson,* 106 S.Ct. at 2514. And, in any event, plaintiffs' own evidence, which only uncovered six firms that were allowed to competitively bid, bolsters defendants' position.

may be released by SBA for competitive bidding. In making such determinations, the district office which services the exiting 8(a) concern may, at the request of such concern, review the following:

(1) Size of the 8(a) concern as it relates to the contract under consideration. If the incumbent firm is or is expected to be other than small at the time of price proposal SBA will disapprove such requests.

(2) Current contracts with options which probably will be performed after the expiration of the concern's final FPPT. If sufficient options exist which will ease the firm's transition to competitive status, SBA normally will not release the contract for competitive bidding.

(3) The importance of the contract for the firm's stability (e.g., contribution to profit, number of employees dedicated to the contract, etc.).

(4) The needs of other, similar 8(a) concerns for this contract through the 8(a) program in order to achieve business plan objectives.

The SBA's decision to retain the Kelly contract within the 2[8](a) program was made by Joseph Luna, the Assistant Regional Administrator in SBA's Dallas office, and is memorialized in a June 26, 1987, memorandum. *See* Exh. B to Motion to Dismiss. Although the Luna memorandum does not address the first factor in paragraph 46(e) (size of the current 2[8](a) firm vis-a-vis the contract), the defendants have conceded that this factor "cuts in plaintiffs' favor." Tr. 25. Mr. Luna noted that the second factor—the existence of contract options easing the transition to competitive status—was fully present in light of the two one-year extensions granted to SAGM

under the Kelly contract, *see* Luna Memorandum at 2, a fact concurred in by plaintiffs. Opposition at 6–8. With respect to the importance of the contract for the firm's stability, Luna noted that SAGM's employees would, in accordance with industry practice, most likely be retained by the next contractor who assumed the Kelly contract.[18] Finally, the Luna memorandum pointed out that another 2[8](a) firm—Rite-Way—needed the Kelly contract to achieve its program objectives, thus satisfying the fourth paragraph 46(e) factor.

■ Although far from a model of clarity, the Luna memorandum establishes that SBA did not act in an arbitrary or capricious manner in deciding to forego competitive bidding on the Kelly contract. The memorandum discloses that the agency considered the relevant factors and articulated its reasons for reaching the decision that it did.[19] Only one of these factors supported SAGM's desire to engage in competitive bidding, and the other factors all militated in favor of retaining the Kelly contract in the 2[8](a) program. Given that the SBA's general policy was to retain 2[8](a) contracts within the program whenever possible and to release these contracts only in the limited circumstances specified in paragraph 46(e), given that Mr. Luna addressed these factors and concluded that the Kelly contract should remain as an 2[8](a) procurement, and given the deferential review accorded to federal agencies in procurement matters, the Court concludes that plaintiffs have failed to carry their burden of demonstrating that the SBA's actions were arbitrary and capricious.

**B. The Air Force Decision**

Section 1207(a) of the National Defense Authorization Act of 1987, Pub.L. No. 99–

---

**18.** Although plaintiffs make much of the fact that Luna did not discuss the impact on so-called "core" employees or the loss of profits SAGM would likely suffer, Opposition at 7–8, Luna did point out that SAGM had branched out to include insurance and security service interests, Luna Memorandum at 2, and the existence of these interests would certainly cushion the blow of graduation from the 2[8](a) program. *See* Luna Dep. at 25–26.

**19.** Plaintiffs argued at the hearing that Luna's memorandum was not an objective determination but rather was prepared with full knowledge of this impending litigation. Tr. 39–40. Aside from this bald assertion, however, plaintiffs offer no evidence to support their claim. Even were this so, the record is absent data to reflect that the memorandum is distorted. In the absence of any such evidence, this Court cannot conclude that the SBA, or Mr. Luna, acted in a disingenuous manner.

661, 100 Stat. 3816, 3973, establishes "a goal of 5 percent" of all Defense Department contracts be awarded to small, disadvantaged businesses (SDBs), black colleges, and other minority institutions. Plaintiffs claim that the Air Force's decision to retain the Kelly contract as an 2[8](a) contract, rather than as an SDB set-aside, violates section 1207 and two of its implementing regulations.[20]

The rather unusual chain of events leading up to the Air Force's conclusion that the Kelly contract should be kept within the 2[8](a) program is recounted in the Declaration of Stephanie Apple, the Kelly contracting officer at the time. *See* Exh. C to Motion to Dismiss. In February 1987, Apple approved the award of the Kelly contract to the SBA under the 2[8](a) program. In April 1987, however, Apple learned that the procuring unit at Kelly was dissatisfied with the qualifications of Rite–Way (which had been chosen by the SBA under the 2[8](a) program); she therefore decided to utilize the SDB set-aside route in filling the contract. After the SBA appealed this decision to the Secretary of the Air Force, after a congressional inquiry into the matter, and after SBA assured the Air Force that Rite–Way would receive the technical assistance it needed to perform the contract,[21] Apple reconsidered her position and decided, in June 1987, to keep the contract within the 2[8](a) framework.

█ Plaintiffs do not attack the Air Force's decisional process as arbitrary and capricious under section 706(2)(A), *see* Complaint ¶¶ 22–24, nor do they seriously dispute Apple's version of these facts.[22] Rather, the complaint first asserts (¶ 22) that the Air Force failed to comply with section 1207 when it made the determination to maintain the contract in 2[8](a) status. This claim is completely without merit

and must be rejected as a matter of law. First, the very language of section 1207(a) states that the 5% contract figure is merely a "goal" that the Defense Department should seek to attain. But—above and beyond that—section 1207(e)(3) plainly authorizes the use of 2[8](a) awards to reach the 5% contracting goal ("the Secretary of Defense may enter into contracts using less than full and open competitive procedures (including awards under section 8(a) of the Small Business Act)"). Plaintiffs' contention based on the language of section 1207 must fail.

On May 7, 1987, the Department of Defense issued interim regulations interpreting section 1207. *See* 52 Fed.Reg. 16,263–67. Plaintiffs assert that the Air Force's actions violated two provisions of these interim regulations that require it to publish a synopsis of the Kelly contract and to make certain findings when setting-aside a contract for SDB treatment. *See* 48 C.F.R. §§ 205.207(d) and 219.502–72(a) (52 Fed. Reg. at 16,264, 16,266). Plaintiffs' argument puts the cart before the horse, however. In accordance with the language of section 1207, the interim regulations make clear that Department of Defense agencies have discretion in determining whether to proceed by way of an SDB set-aside or through the 2[8](a) program. *See* 48 C.F. R. § 219.201(a) (52 Fed.Reg. at 16,265). Moreover, the regulations stress that the 2[8](a) program, rather than the set-aside procedure, is the preferred path. *See* 48 C.F.R. § 219.801 ("The Department of Defense, *to the greatest extent possible*, will award contracts to the SBA under the authority of section 8(a) of the Small Business Act and will actually identify requirements to support the business plans of 8(a) concerns") (emphasis added) (52 Fed.Reg. at 16,267).[23] Because they do not challenge

---

**20.** There is no dispute that SAGM would qualify as an SDB if the Air Force had chosen to go that route.

**21.** Ironically, one of the consultants being considered by the SBA to provide technical assistance to Rite–Way is plaintiff Molina. *See* Tr. 26–29.

**22.** Plaintiff's listing of material facts in dispute begins by stating that the Air Force "misapplied

and violated mandatory provisions in those implementing regulations" (Opposition at 12) and goes on to describe plaintiffs' version of which regulations apply. *Id.* at 13–14. These are, of course, questions of law, *not* facts in dispute.

**23.** This reading of the regulations is also supported by the Taft Memorandum of March 18, 1987, which provided guidance to military and defense agencies prior to promulgation of the

the Air Force's exercise of its discretionary authority to award the contract by means of an 2[8](a) award, plaintiffs cannot be heard to complain that the agency failed to apply proper set-aside procedures.

## V. Conclusion

The defendants' motion for summary judgment will be granted. The applicability of SBA and Air Force regulations and the interpretation of relevant statutory provisions are questions of law appropriate for resolution on a motion for summary judgment. And the only issue that is not a pure question of law—whether the SBA acted in an arbitrary and capricious fashion under paragraph 46(e) of SOP 80-05—presents no genuine issues of material fact that would preclude summary judgment. Because the defendants did not violate applicable laws, rules or regulations, plaintiffs' request for declaratory and injunctive relief will accordingly be denied.

interim regulations. *See* Exh. H to Motion to Dismiss at ¶¶ 1(B), 3(B)(1).