**Deborah LEE, et al., Plaintiffs,**

v.

**Jack KEMP, Defendant.**

**Civ. A. No. 88–2395–OG.**

United States District Court,
District of Columbia.

July 27, 1989.

Bill Bradford, Nadine Sampter and William P. Flanagan, Hogan & Hartson, Washington, D.C., and Florence Wagman Roisman, Nat. Housing Law Project, Washington, D.C., for plaintiffs.

Frederick Morgan, Jr. and Arthur Goldberg, Dept. of Justice, Washington, D.C., and Gershon Ratner, Dept. of Housing and Urban Development, Washington, D.C., for defendant.

## MEMORANDUM

GASCH, Senior District Judge.

This is an action to enjoin the Department of Housing and Urban Development ("HUD") from selling or disposing of houses in its single-family inventory other than for the benefit of the homeless. Plaintiffs argue that HUD's policies governing the sale of houses from its single-family inventory violate the National Housing Act, the Fair Housing Act, the Administrative Procedure Act, and the Stewart B. McKinney Homeless Assistance Act.[1]

*Procedural History*

On August 26, 1988, Judge Thomas F. Hogan entered a temporary restraining order ("TRO") prohibiting HUD from selling single-family properties from its inventory in the state of Michigan. Plaintiffs amended their complaint and filed a motion for a nationwide TRO on August 29. On August 30, Judge Harold H. Greene entered a TRO enjoining HUD from selling any homes in the single-family inventory other than for the benefit of homeless and low income persons. On September 21, 1988, this Court denied plaintiffs' motion for preliminary injunction. *Lee v. Pierce*, 698 F.Supp. 332 (D.D.C.1988). Before the Court are the parties' cross-motions for summary judgment.

## I. FACTUAL BACKGROUND

*Plaintiffs*

The four individual plaintiffs are women who have children and reside in homeless shelters. Three of the four are members of minority groups. There are two types of organizational plaintiffs. Two organizations, Philadelphia Union of the Homeless and Community for Creative Non–Violence, are made up primarily of homeless persons. They represent their members' legal interests and endeavor to provide shelter and medical care. Five organizational plaintiffs are nonprofit charitable organizations that aid homeless and low-income persons in ways that include acquiring and, if necessary, renovating, housing. Plaintiffs represent a class made up of all homeless and underhoused families and individuals in the United States and all organizations in the United States that provide assistance to homeless or underhoused families or individuals.

*Defendant*

The defendant, Jack Kemp, is the Secretary of HUD.[2] Under Section 203 of the National Housing Act, HUD is authorized to insure mortgages for family residences. 12 U.S.C. § 1709. Section 202 of the Act created the Mutual Mortgage Insurance Fund ("MMIF") program, a revolving fund used by the Secretary to carry out the Section 203 mortgage insurance program. *See* 12 U.S.C. § 1708. Approximately 90 percent of the homes insured in the Federal Housing Administration ("FHA") single family mortgage insurance program are insured through the MMIF. The balance of the homes are from the other mortgage fund programs that make up the Section 203 insurance program: the Special Risk Insurance Fund, *id.* § 1715z–3, and the General Insurance Fund, *id.* § 1715z.

The MMIF is a revolving fund which uses the proceeds from insurance premiums, investment income, and foreclosure sales to provide funds for future mortgage insurance.[3] Third Martin Declaration at ¶ 3. HUD does not receive congressional appropriations for operation of the MMIF. In 1986, according to HUD documents, the MMIF spent 1.975 billion dollars and took

---

1. Although plaintiffs asserted a National Environmental Policy Act claim in their initial complaint, that cause of action has been abandoned.

2. Jack Kemp is substituted for former Secretary Samuel R. Pierce, Jr., pursuant to Fed.R.Civ.P. 25(d).

3. The General Insurance Fund and the Special Risk Insurance Fund are funded by Congress. In fiscal year 1988, 12,947 foreclosed properties were acquired by these two funds at a cost of 559 million dollars. Third Martin Declaration at 3.

in 3.756 billion dollars, for a "surplus" of 1.781 billion dollars. Exhibit 1 to Plaintiffs' Opposition to Defendant's Motion for Summary Judgment. In 1987, the MMIF had 4.682 billion dollars in outlays and received 5.737 billion dollars, for a "surplus" of 1.055 billion dollars. In August, 1988, the MMIF had a positive net worth of 3.5 billion dollars. Letter from M. Dorsey, HUD General Counsel, Exhibit E to Complaint for Temporary Restraining Order. Budget documents for fiscal year 1988 were not made part of the record, but a HUD official declared that the MMIF would have a large deficit for that year and fiscal year 1989. Third Martin Declaration at ¶ 3.

Under the Section 204 mortgage insurance program, when a mortgagee forecloses on federally insured property, it can file a claim for insurance benefits. 12 U.S.C. § 1710(a); 24 C.F.R. § 203.355–57. In most cases, the mortgagee must deed title to HUD and deliver the property in vacant condition to receive its benefits. Within 14 days of acquisition HUD advertises the property for sale in a bidding process. The time for submitting bids closes 10 days after the advertisement appears. To bid, a prospective owner must submit a signed HUD sales contract and an earnest money deposit to a real estate broker. HUD accepts bids only through brokers. The amount of the earnest money deposit is set by the field office conducting the sale at an amount between $500 and $2,000. Third Martin Declaration at ¶ 29. Offers are accepted "based on the highest net return to HUD, with priority to owner-occupants only in the case of a tie net offer." *HUD Property Disposition Handbook, One to Four Families,* 6–5 (No. 4310.5 Rev. 1) (April, 1987) (Plaintiff's Exhibit 8). The sale is ordinarily closed within 60 days of HUD's acceptance of the bid. HUD's sales program is not administered on a nationwide basis; its 73 field offices conduct the programs.

As of January, 1989, HUD had 47,319 homes in its single family inventory as a result of foreclosures. Third Martin Declaration at ¶ 4. In fiscal year 1987, HUD acquired 64,269 homes and sold 59,194. *Id.* In fiscal year 1988, HUD acquired 83,979 homes. During this same period, HUD sold 81,517 properties. Approximately 71,000 were MMIF properties and the other 12,000 were insured by either the General Insurance Fund or the Special Risk Insurance Fund.

The average selling price of homes from the single-family inventory was $38,000 in 1988. *Id.* at ¶ 20. A HUD survey estimates that 30 percent of the single-family houses are sold to investors who rent the properties or resell them for profit.[4] *Id.* at ¶ 26. Affidavits from leaders of various non-profit organizations ("housing providers") that have attempted to acquire these single-family houses estimate the figure to be much higher, especially in urban areas, such as the District of Columbia, where affordable housing is scarce. *See Lee v. Pierce,* 698 F.Supp. at 336.

HUD has three programs intended to assist the homeless. In its Reduced Sales Program, HUD offers a ten percent discount to qualified homeless organizations on certain properties before advertising the homes for sale. First Martin Declaration at ¶ 32(a). HUD has sold 183 single-family properties to homeless providers through this program since 1985. Third Martin Declaration at ¶ 13.

HUD has a Lease–Option Program whereby it enters into six-month lease-purchase option agreements with homeless providers. HUD also has a Lease Program by which it leases certain houses to homeless organizations at a cost of one dollar per year on a case-by-case basis. Originally, only those homes insured by either the Special Risk Fund or the General Insurance Fund were eligible for the lease programs. But recently HUD also began making MMIF properties available on a limited ba-

---

4. The survey examined the 10,058 bids accepted between September 21, 1988 and November 4, 1988 at HUD's 20 highest-volume field offices. Plaintiffs contest the validity of these figures.

*HUD's earlier estimate in these proceedings was that fifty percent of the homes were sold to investors. Second Martin Declaration at 2.*

sis, although it expects that few MMIF properties will be made available through the program. Currently, 293 houses are leased under these programs, 217 from General Insurance Fund properties and 76 from MMIF properties. First Martin Declaration at ¶ 25; Third Martin Declaration at ¶ 13.

Plaintiffs allege that they have been "frustrated and rebuffed" when seeking to obtain housing under these programs, and that the HUD local field offices are either not aware of or not supporting the programs. *See* Declaration of Rodman McCoy, Director of Program Services of Neighborhood Housing Services; Declaration of Rev. Thomas Knoll. A phone survey conducted by plaintiffs of housing providers in 32 cities revealed that none was aware of these HUD programs. Declaration of Mary Ellen Hombs, Analyst for National Coalition for the Homeless. In their declarations in this case, several organizations specifically averred that when they sought to purchase single-family houses at some type of discount, HUD field offices told them HUD was forbidden from selling the houses under any circumstances other than sale to the highest bidder. *See* Declaration of Rev. Jim Dickerson, Director of MANNA; Declaration of Rodman McCoy. In one instance, the Washington field office allegedly told area housing providers that it would accept bids for a block of properties on a preferential basis, the organizations submitted bids, and the field office rescinded the sale on orders from the national office. Declaration of Rev. Jim Dickerson.

## II. STANDING

### A. *The National Housing Act*

 The Court previously held that plaintiffs had standing to maintain their National Housing Act claim. *Lee v. Pierce*, 698 F.Supp. at 336–37. Defendant does not contest the Court's holding that plaintiffs

meet the case and controversy requirement. Instead, he argues that the prudential "zone-of-interest" test is not satisfied. In defendant's view, plaintiffs do not have standing to maintain this action because the interest they seek to protect does not fall within the zone of interests protected by the National Housing Act.

The Administrative Procedure Act ("APA") grants standing to those "aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Even if the plaintiffs are injured by agency action, the Supreme Court considers "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute." *Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). In *Clarke v. Securities Industry Association*, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987), the Supreme Court revisited the elements of the zone of interest test. The Court noted that the phrase "a relevant statute" should be interpreted "broadly." *Id.* at 399, 107 S.Ct. at 757. The Court also recognized that agency action is presumptively reviewable, and thus only "those would-be plaintiffs not even 'arguably within the zone of interests to be protected or regulated by the statute....'" should be excluded on prudential grounds. *Id.* at 397, 107 S.Ct. at 756 (quoting *Data Processing*, 397 U.S. at 153, 90 S.Ct. at 829).

Plaintiffs contend that they are the intended beneficiaries of the National Housing Act. *See* 42 U.S.C. § 1441.[5] Defendant concedes that plaintiffs are the intended beneficiaries of Section 1441. But he contends that because plaintiffs challenge the single-family property disposition program—a part of the National Housing Act—only that portion of the statute should be examined when defining the relevant zone of interests.[6] In his view, Sec-

---

**5.** There is no question that plaintiffs fall within the zone of interests of Section 1441. "[T]he Act was intended to benefit low and moderate-income families." *Angleton v. Pierce*, 574 F.Supp. 719, 727 (D.N.J.1983), *aff'd*, 734 F.2d 3 (3d Cir.),

*cert. denied*, 469 U.S. 880, 105 S.Ct. 245, 83 L.Ed.2d 183 (1984).

**6.** Naturally, the second part of defendant's argument is that plaintiffs do not fall within the zone of interests of the single-family mortgage

tion 1441 is irrelevant to the inquiry: In support of this theory, he relies on *Tax Analysts and Advocates v. Blumenthal*, 566 F.2d 130 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), where the D.C. Circuit refused to examine provisions of the tax code other than the provision at issue when considering whether plaintiff fell within the zone of interests:

> The question then becomes: does the court look to this section of the statute (the Code) to determine which interests are arguably to be regulated or protected for purposes of the zone test, or should the court look to other sections of the statute for evidence of arguable regulatory or protective intent? The Supreme Court decisions dealing with the zone test do not provide a conclusive answer to this inquiry.... [W]e shall look only to Section 901 of the Code.

566 F.2d at 140.

The Supreme Court's recent decision in *Clarke v. Securities Association* illustrates the error of this approach. The Comptroller of the Currency argued in that case that the limitation on branch banking contained in 12 U.S.C. § 36 was not intended to benefit the respondents. The Comptroller did not address the interests to be protected by the statute as a whole. The Supreme Court examined the statute in its entirety to ascertain the protected zone of interests:

The Comptroller's argument focuses too narrowly on 12 U.S.C. § 36, and does not adequately place § 36 in the overall context of the National Bank Act. As *Data Processing* demonstrates, we are not limited to considering the statute under which respondents sued, but may consider any provision that helps us to understand Congress' overall purposes in the National Bank Act.

479 U.S. at 401, 107 S.Ct. at 758. *Clarke* explicitly noted that the D.C. Circuit's practice of viewing the statutory section in isolation was "inconsistent with our understanding of the 'zone of interest test' as now formulated." *Clarke*, 479 U.S. at 400 n. 15, 107 S.Ct. at 757 n. 15 (disapproving of *Control Data Corp. v. Baldrige*, 655 F.2d 283, 293–94, *cert. denied*, 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981)).

A post-*Clarke* decision in the D.C. Circuit makes clear that this Court should "look for the requisite protective intent on the part of Congress not only in the specific statutory provision at issue but also in other provisions of a statute." *Investment Co. Inst. v. FDIC*, 815 F.2d 1540, 1545 (D.C.Cir.), *cert. denied*, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987). The Court, therefore, turns to the National Housing Act.

By the plain language of the statute, the National Housing Act goals enunciated in 42 U.S.C. § 1441 apply to all National Housing Act programs.[7] Courts in this and other circuits have consistently applied

---

insurance program. In defendant's view, only those who can qualify for a mortgage under the program are within the zone of interests. He argues that, by definition, homeless persons cannot qualify for mortgages.

Plaintiffs vigorously contest defendant's assertion that they are, *per se*, unable to participate in the mortgage program. Some of the organizational plaintiffs do hold mortgages. Moreover, some of the individual plaintiffs apparently had mortgages before becoming homeless. Plaintiffs, however, overlook the assertion in their complaint that homeless and low-income persons do not "have the resources to purchase HUD's homes at anything approaching market prices." Complaint ¶ 24.

Because the Court rejects defendant's standing argument at the first step, holding that National Housing Act as a whole informs the Court's application of the zone-of-interest test, it need

not resolve the second step of defendant's argument.

7. Section 2 of the Housing Act of 1949, provides, in relevant part, that:

> the general welfare and security of the Nation and the health and living standards of its people require ... realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family.... The *Department of Housing and Urban Development ... shall exercise [its] powers, functions, and duties under this or any other law, consistently with the national housing policy declared by this Act* and in such manner as will facilitate sustained progress in attaining the national housing objective hereby established.

42 U.S.C. § 1441 (emphasis added).

the goals of Section 1441 to HUD's multi-family disposition programs. *E.g., Russell v. Landrieu,* 621 F.2d 1037, 1041 (9th Cir. 1980); *Commonwealth of Pennsylvania v. Lynn,* 501 F.2d 848, 855 (D.C.Cir.1974). Indeed, as noted above, defendant does not contend that plaintiffs are outside the zone of interests to be protected by Section 1441 of the National Housing Act. Consequently, plaintiffs have standing to challenge HUD's alleged failure to take the goals of Section 1441 into account when administering the single-family property disposition program.

### B. *The Fair Housing Act*

█ The Fair Housing Act, 42 U.S.C. § 3601 *et seq.,* prohibits discrimination in the sale or rental of housing. The Act requires HUD to "administer the programs and activities relative to housing and urban development in a manner affirmatively to further the policies" of the Fair Housing Act. 42 U.S.C. § 3608(e)(5) (1982). Defendant contends that plaintiffs have not satisfied the causation prong of the standing requirement with respect to their Fair Housing Act claim. It is settled that plaintiffs must show an injury in fact that is "fairly traceable" to the conduct complained of and "likely to be redressed by a favorable decision." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). In defendant's view, plaintiffs have not shown that their injury—homelessness—is traceable to HUD's actions or would be redressed by the relief they request.

Plaintiffs ask this Court to require HUD to comply with the Fair Housing Act by considering the effect that sales have on the racial makeup of the communities in which HUD houses are located. They suggest, for example, that a preference for minority purchasers may be appropriate in some instances. Plaintiffs argue that such a remedy would be effective because their

injury is not merely homelessness, but "an inability to meaningfully participate in the single-family program." Plaintiff's Reply Memorandum at 8. If applied, the Fair Housing Act would, in plaintiffs' view, cause fewer single-family homes to be sold to investors and more to minorities. There is no evidence in the record indicating that HUD's single-family property disposition program has any effect on the racial composition of the communities where the houses are sold.[8]

In *Jorman v. Veterans Administration,* 830 F.2d 1420 (7th Cir.1987), the court addressed the difficulty of attempting to show that the Veterans Administration's disposition program for houses acquired by foreclosure had caused, or would redress, the injury of segregated neighborhoods. "Plaintiffs' burden to show causation is unusually heavy; in an area fraught with complex motivations and factors, plaintiffs must show that changing one or two factors would have substantially affected the result." *Id.* at 1425. That analysis rings true in the instant case. There is little evidence that these foreclosed properties are being resold (or resold and subsequently rented) to persons whose race differs from that of the previous occupant. In the absence of any data about what, if any, effect HUD's program has on racial concentration, and how many, if any, minorities might participate in a hypothetical HUD affirmative action program, it would be wholly speculative for the Court to conclude that plaintiffs' injuries have been caused by, or would be redressed by, the relief they seek. The Court holds that plaintiffs do not have standing to bring their Fair Housing Act claim.

### III. COMMITTED TO AGENCY DISCRETION BY LAW

#### A. *Background*

The APA provides that persons "suffering legal wrong because of agency action,

---

8. HUD concedes that it makes no effort to collect information regarding the race of those who purchase foreclosed homes or the racial composition of the communities in which those homes are located. Plaintiff's Statement of Material Facts ¶¶ 28–29. HUD has conducted no

inquiries into the relationship of the Fair Housing Act and the single-family property disposition program. *Id.* ¶ 27. Plaintiffs, however, have adduced no evidence that HUD's single-family property disposition program has segregative or discriminatory effects.

or adversely affected or aggrieved by agency action" are "entitled to seek judicial review thereof." 5 U.S.C § 702. The Court is empowered to "compel agency action unlawfully withheld or unreasonably delayed" and to set aside arbitrary or capricious actions. 5 U.S.C. § 706. If, however, the "agency action is committed to agency discretion by law," the APA does not apply. *Id.* § 701(a)(2).

It is well settled that subsection 701(a)(2) is a "very narrow exception" to the general rule that agency action is reviewable. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). The exception applies, for example, "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Id.* at 410, 91 S.Ct. at 820 (quoting S.Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)). The starting point for considering whether agency action is unreviewable is a "careful examination of the statute on which the claim of agency illegality is based." *Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 2052, 100 L.Ed.2d 632 (1988). As with the zone-of-interest analysis, this raises the question of whether the Court should look only to the statutory provision authorizing HUD's disposition program, or to the policies of the National Housing Act as a whole, embodied in Section 1441.

In *Webster,* respondent contended that his termination by the Director of Central Intelligence was arbitrary and capricious. Section 102(c) of the National Security Act provided that the Director "may in his discretion, terminate the employment" of agency employees "whenever he shall deem such termination necessary or advisable in the interests of the United States." 50 U.S.C. § 403(c). While reasoning that the Director's action was committed to agency discretion and nonreviewable, the Supreme Court considered both "[t]he language of § 102(c)" and "the overall structure of the National Security Act." 108 S.Ct. at 2052. "Section 102(c) ... is part and parcel of the entire Act, and likewise exhibits the Act's extraordinary deference to the Director...." *Id.* at 2052–53. In sum, the Supreme Court considered not only the specific statutory provision upon which the claim was based, but the statute as a whole, when determining reviewability. The D.C. Circuit has explicitly stated that the entire statute should be perused for standards that inform the agency's discretion:

> Even when there are no clear statutory guidelines, courts often are still able to discern from the statutory scheme a congressional intention to pursue a general goal. If the agency action is found not to be reasonably consistent with this goal, then the courts must invalidate it. The mere fact that a statute grants broad discretion to an agency does not render the agency's decisions completely unreviewable under the "committed to agency discretion" exception unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised.

*Robbins v. Reagan,* 780 F.2d 37, 45 (D.C. Cir.1985) (per curiam); *see also San Antonio Gen. Maintenance, Inc. v. Abdnor,* 691 F.Supp. 1462, 1466 (D.D.C.1987).

B. *Application to the case at bar*

■ The Court turns first to the language of the statutory provisions at issue. HUD's statutory authorization for disposal of properties acquired in the single-family mortgage insurance program comes from Section 204 of the National Housing Act of 1934, which reads:

> Notwithstanding any other provision of law relating to the acquisition, handling, or disposal of real property by the United States, the Secretary shall have power to deal with, complete, rent, renovate, modernize, insure, or sell for cash or credit, in his discretion, any properties conveyed to him....

12 U.S.C. § 1710(g). Section 2 of the Housing Act of 1949, which plaintiffs contend should inform the Secretary's discretion, provides, in part:

> The Congress hereby declares that the general welfare and security of the Nation and the health and living standards of its people require ... realization as

soon as feasible of the goal of a decent home and a suitable living environment for every American family.... The Department of Housing and Urban Development ... shall exercise [its] powers, functions, and duties under this or any other law, consistently with the national housing policy declared by this Act and in such manner as will facilitate sustained progress in attaining the national housing objective hereby established.

42 U.S.C. § 1441.

Defendant contends that the disposition of properties in the single-family mortgage insurance program is committed to agency discretion and thus unreviewable. Plaintiffs argue that the goals and policies of the National Housing Act, 42 U.S.C. § 1441, provide a meaningful standard for review of the Secretary's actions taken pursuant to 12 U.S.C. § 1710(g).

Defendant relies on cases holding that HUD's determination of the appropriate level of rent to be charged in multi-housing projects is not reviewable. *See Frakes v. Pierce*, 700 F.2d 501, 504 (9th Cir.1983) (citing cases); *Hahn v. Gottlieb*, 430 F.2d 1243 (1st Cir.1970). The statutes at issue in *Frakes* gave the Secretary the authority to regulate rents at multifamily projects "in such form and in such manner as in the opinion of the Secretary will effectuate the purposes of this section" and "in accordance with such requirements with respect to ... rents as the Secretary may prescribe." 700 F.2d at 505 (citations omitted). The Ninth Circuit reasoned that "HUD must be able to assess the income needs of each project on an individualized basis." *Id.* at 506 (citation omitted). The court concluded that the Secretary had unchecked discretion to set rents.

In *Hahn*, the Court set out three factors to apply when considering whether review was permitted:

[F]irst, the appropriateness of the issues raised for review by the courts; second, the need for judicial supervision to safeguard the interests of the plaintiffs; and third, the impact of review on the effectiveness of the agency in carrying out its assigned role.

*Hahn*, 430 F.2d at 1249; *accord, Natural Resources Defense Council v. SEC*, 606 F.2d 1031, 1044 (D.C.Cir.1979). In *Heckler v. Chaney*, 470 U.S. 821, 834, 105 S.Ct. 1649, 1657, 84 L.Ed.2d 714 (1985), however, the Supreme Court concluded that the second factor should not be applied. The first and third parts of the *Hahn* test roughly follow the Supreme Court's lead in not only reviewing the particular statute at issue, but also considering the nature of the judgment that was made, *Webster*, 108 S.Ct. at 2052 (citing the "overriding need for ensuring integrity" in CIA personnel); *Department of the Navy v. Egan*, 484 U.S. 518, 108 S.Ct. 818, 824, 98 L.Ed.2d 918 (1988), and the "disruptive practical consequences" of reviewing the action. *Southern Ry. Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 457, 99 S.Ct. 2388, 2395, 60 L.Ed.2d 1017 (1979).

*Frakes* and *Hahn* do not demonstrate, however, that the Secretary's actions in the instant case are unreviewable. At issue in *Frakes* was the appropriate level of rent to be charged in a particular housing project, a question poorly suited to judicial resolution. But compliance with a statutory directive, in this case Section 1441, is an appropriate issue to be tackled by the judiciary. The impact of judicial review is also less onerous in the instant case. Unlike the "individualized" and frequently recurring rent determination at issue in *Frakes*, plaintiffs in this action ask HUD to review its disposition rules. Thus, review of HUD's compliance with Section 1441 would not unduly intrude upon or delay the Secretary's implementation of the program. In short, the factors mitigating against review in the rent-increase cases are not present in this case.

Courts have frequently reviewed HUD's management of property programs for compliance with Section 1441 in contexts other than rent increases. *See Russell v. Landrieu*, 621 F.2d 1037 (9th Cir.1980); *Kent Farm Co. v. Hills*, 417 F.Supp. 297 (D.D.C.1976); *Cole v. Lynn*, 389 F.Supp. 99 (D.D.C.1975). Other authorities demonstrate that although the Secretary has broad discretion under 12 U.S.C. § 1710(g)

to dispose of foreclosed properties in the manner he sees fit, Congress intended that he consider Section 1441 when implementing United States housing programs. Judge Gesell's reasoning in *Kent Farm Co. v. Hills* is equally applicable to this case:

> HUD has authority to foreclose the project under section 207(k) of the National Housing Act ... and ... its decision is largely committed to its discretion by those enactments.... Nonetheless, that discretion is not absolute and certainly may not be exercised in a fashion that ignores HUD's overall responsibilities under various congressional enactments to further national housing policies.

417 F.Supp. at 302. Although the Secretary's policy regarding disposition of foreclosed houses involves the weighing of numerous factors beyond the Court's expertise, it does not follow that the Secretary is free to disregard the statutory guidance provided by Congress. The complicated nature of the decision simply makes it more likely that the Court will defer to the Secretary's decision when conducting its review.

Numerous cases involving multi-family properties have reached this same conclusion:

> In exercising his discretion to dispose of HUD-acquired property, the Secretary must act, whenever possible, in a manner which is consistent with the objectives and priorities of the National Housing Act. Actions taken without consideration of these policies, or in unnecessary conflict with them, will not stand.

*Russell v. Landrieu,* 621 F.2d 1037, 1041 (9th Cir.1980) (citing *Pennsylvania v. Lynn,* 501 F.2d 848, 855 (D.C.Cir.1974); *Shannon v. HUD,* 436 F.2d 809 (3d Cir. 1970)). For example, in *Kirby v. United States,* 675 F.2d 60 (3d Cir.1982), plaintiffs claimed that a HUD-sponsored project would not benefit the elderly as required by 12 U.S.C. § 1701q. The statute provided that HUD " 'may make loans' to qualifying corporations," *id.* at 68 (citing 12 U.S.C. 1701q(a)(2)), and "may consider" whether the proposed project would benefit the com-

munity. The Court found that this was not action committed to agency discretion:

> [D]espite what appears to be an unbridled grant of discretion, this court has already recognized that HUD's broad discretion in approving projects must be exercised in a manner consistent with the national housing objectives set forth in the several applicable statutes. Thus, at the very least, this court can review a HUD decision to assure itself that it is not in conflict with those policies.

675 F.2d at 68. In conclusion, HUD's actions with respect to the disposition of properties in the single-family inventory are reviewable.

## IV. DISCUSSION

### A. *National Housing Act Claim*

#### 1. The NHA applies to the single-family program

 Plaintiffs contend that HUD's disposition program for single-family homes fails to consider the statutory "goal of a decent home and a suitable living environment for every American family." 42 U.S.C. § 1441. The Secretary first argues that Section 1441 is not applicable to actions undertaken pursuant to the single-family property mortgage insurance program. It is, however, well established that the housing goals codified at Section 1441 are "not precatory. HUD is obliged to follow these policies. Action taken without consideration of them, or in conflict with them, will not stand." *Commonwealth of Pennsylvania v. Lynn,* 501 F.2d 848, 855 (D.C.Cir.1974). Courts have uniformly invalidated HUD actions that did not consider this statutory goal.

In *Cole v. Lynn,* 389 F.Supp. 99 (D.D.C. 1975), the Court held that HUD could not demolish a housing project because it had not considered whether alternatives might better serve the goals of the National Housing Act.

> Congress did not intend HUD to be a commercial lending agency.... The Secretary cannot avoid giving full consideration to all available options to effectuate national housing policy.

*Id.* at 103. In *Cole,* HUD's policy was to "dispose of all acquired multifamily properties at the earliest possible date at the highest price obtainable in the current market." *Id.* at 102 (citing *HUD Property Disposition Handbook for Multifamily Properties,* (HM 4315.1) (Feb. 17, 1971)). Similarly, HUD's policy in the instant case is to dispose of its single-family houses quickly and maximize its dollar return. Plaintiffs argue that HUD's policy with respect to its single-family properties, like its policy with respect to the multi-family properties in *Cole v. Lynn,* violates the statute because HUD does not consider any alternatives. *See Cole v. Lynn,* 389 F.Supp. at 103 ("It is not for the Court to weigh the merits of the statutory alternatives available ... but it can require that [HUD] ... consider these alternatives.").

More recently, courts have cited the obligations in the National Housing Act when enjoining HUD from selling a low income housing project to a private purchaser, *Russell v. Landrieu,* 621 F.2d 1037, 1041 (9th Cir.1980), and from selling mortgages on multi-family housing projects, *Walker v. Pierce,* 665 F.Supp. 831 (N.D.Cal.1987). In *Walker,* as here, HUD had "statutory authority to sell mortgages." *Id.* at 837. The court held, nonetheless, that:

> HUD abused [its] discretion in deciding to proceed with the mortgage sales at issue here. The Secretary acted in conformity with ... policies that are totally unrelated to the objectives of the National Housing Act, such as the maximization of financial return to the federal government.

*Id.* at 841. In sum, it is by now hornbook law that HUD cannot base its decisions solely on what will create the most revenue for the government. *Id.* at 838 ("the Secretary's actions must be invalidated if he acts only to obtain maximum financial return for HUD and he fails to consider and imple-

ment alternatives that would have enabled him to effect the objectives of the [National Housing] Act"); *Russell v. Landrieu,* 621 F.2d at 1041; *United States v. Winthrop Towers,* 628 F.2d 1028 (7th Cir.1980); *Kent Farm Co. v. Hills,* 417 F.Supp. 297 (D.D.C. 1976); *Brown v. Lynn,* 385 F.Supp. 986, 998 (N.D.Ill.1974).

The Secretary suggests that these cases are not dispositive because the single-family mortgage program is different from the multi-family programs at issue in these cases.[9] He says that the courts in those cases did not account for the self-sustaining nature of the MMIF. This argument is unavailing. Although some multi-family programs are not self-sustaining, some do have the same revolving-fund characteristics of the single-family mortgage programs. *See Russell v. Landrieu,* 621 F.2d at 1041 (referring to HUD's obligation to "protect the insurance fund"). Moreover, HUD overlooks the fact that two of the three single-family programs (which purchased over 12,000 houses in 1988 alone) are not self-sustaining. But most importantly, the Secretary fails to recognize that the congressional directive to operate the MMIF in an actuarily sound manner does not preclude consideration of National Housing Act goals. For example, the MMIF has accumulated huge surpluses in past years, suggesting some room for actions other than those maximizing financial return. Moreover, sale of homes is only one of several sources of funds for the MMIF. In short, the Secretary's contention that the self-sustaining nature of the fund distinguishes the long line of cases cited above is unpersuasive. The Court holds that the Secretary must take the goals set out in 42 U.S.C. § 1441 into account when implementing 12 U.S.C. § 1710(g).

---

**9.** The Secretary also argues that by reenacting the mortgage insurance program without amending it in any way relevant to this action, Congress has adopted his interpretation that the National Housing Act goals do not apply. *See Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978). However, the creation of the Special Risk Insurance Fund and the General Insurance Fund suggests that Congress does not agree that the National Housing Act is a dead letter where single-family properties are concerned. Moreover, HUD has special programs to benefit low-income purchasers, including the sale and lease programs, making HUD's view that Section 1441 may be ignored less than clear.

### 2. *HUD's compliance with the NHA*

■ HUD argues, in the alternative, that its single-family property disposition policy complies with the National Housing Act. As the Court noted in its decision on the motion for preliminary injunction, this issue "turns on the factual question of whether HUD has taken the Act's imperatives into consideration." 698 F.Supp. at 342. The Secretary argues that the three lease programs now in place demonstrate that the proper consideration has been given to the goals of Section 1441. Under these programs, 293 properties are presently leased to homeless providers. Moreover, since 1983, HUD has sold 183 properties to homeless assistance organizations. To give some meaning to these figures, the Court notes that HUD acquired a total of 148,248 properties in fiscal years 1987 and 1988.[10]

Plaintiffs argue that HUD's current programs are so minimal and ineffective that they illustrate the Secretary's inattention to the goals and policies of Section 1441. There is no administrative record in this case demonstrating that the Secretary considered alternatives to the current policy of maximizing the financial return on each property.[11] Defendant's post hoc rationalization that the 476 leased and sold properties reflect his reasoned contemplation of the goals of Section 1441 is unpersuasive. The Secretary's assertion that "the current homeless initiatives represent what can be done at this time," Defendant's Opposition at 20, is not supported by any evidence. The Secretary is obliged to " 'articulate the standards and principles that govern [his] decisions in as much detail as possible.' " *Kent Farm Co. v. Hills*, 417 F.Supp. 297, 302 (D.D.C.1976) (quoting *Environmental Defense Fund v. Ruckelshaus*, 439 F.2d 584, 598 (D.C.Cir.1971)). This Court's "constitutional responsibility to see that federal statutes are administered in a manner consistent with congressional directives," *id.*, does not permit it to accept the Secretary's unsupported assertion that he has considered the policies of the National Housing Act. In conclusion, the Secretary has wide discretion to incorporate the policies and objectives of the National Housing Act in the single-family property disposition program as he sees fit. But his discretion is not unfettered:

> The court's responsibility is not to supplant the [agency's] balance of ... interests with one more nearly to its liking, but instead to assure itself that the [agency] has given reasoned consideration to each of the pertinent factors.

*Permian Basin Area Rate Cases*, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968), *quoted in Cole v. Lynn*, 389 F.Supp. 99, 104 (D.D.C.1975). The Secretary's unchecked emphasis on maximizing the financial return to the insurance funds belies his assertion that he has considered Congress' directive in Section 1441. It may be that the current level of programs to assist potential low-income homebuyers is the optimal level in light of HUD's responsibility to safeguard the insurance funds. But the Secretary must reach this determination after reasoned decisionmaking. The failure to consider alternatives to the present policy constitutes an abuse of discretion.

### B. *Notice and Comment Rulemaking*

■ Plaintiffs claim that HUD has failed to comply with the notice-and-comment rulemaking procedures of the APA, 5 U.S.C. § 553, and HUD's own rulemaking regulations, 24 C.F.R. § 10.1–.20. The APA expressly excludes from the rulemaking requirements actions pertaining to public property. 5 U.S.C. § 553(a)(2). However, HUD has voluntarily subjected itself to rulemaking requirements that are sub-

---

**10.** If the 476 houses sold or currently being leased were drawn from the 1987 and 1988 inventories only, HUD has dedicated less than one-third of one percent of its inventory to these programs.

**11.** The Court will consider whether the Secretary has abused his discretion or failed to act in accordance with law. The scope of the Court's review is "narrow," and the Court may not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). However, the Court "must consider whether the decision was based on a consideration of the relevant factors." *Id.*

stantially the same as those prescribed in the APA.[12] *See* 24 C.F.R. § 10. HUD's policy is "to provide for public participation in rulemaking with respect to all HUD programs and functions." 24 C.F.R. § 10.1. "Rule" is defined as "all or part of any Departmental statement of general or particular applicability and future effect designed to: (1) Implement, interpret, or prescribe law or policy." *Id.* § 10.2. The purpose of requiring notice and comment is twofold: to facilitate "public participation and fairness to affected parties" and to "assure that the agency will have before it the facts and information relevant to a particular administrative problem, as well as suggestions for alternative solutions." *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C.Cir.1987).

There are, however, narrow exceptions to the notice and comment procedures. The rulemaking requirements are not required for "statements of policy, interpretive rules, [and] rules governing the Department's organization or its own internal practices or procedures." 24 C.F.R. § 10.1. These exceptions are "an attempt to preserve agency flexibility in dealing with limited situations where substantive rights are not at stake." *American Hosp. Ass'n v. Bowen*, 834 F.2d at 1045.

Plaintiffs argue that HUD's property disposition procedures, as reflected in the annual *HUD Property Disposition Handbook, One to Four Family Properties* and in memoranda, constitute "rules" within the meaning of the regulation. HUD contends that its written statements regarding the disposition of single family properties fall within the exception for "statements of policy" and "rules governing the Department's ... internal procedures." 24 U.S.C. § 10.2; *see also* 5 U.S.C. § 553(d)(2). Defendant argues that two of the five changes in HUD policy are procedural and that the other three are policy statements.

The distinction between substantive rules requiring notice and comment and *procedural rules* that are excepted rules was addressed by the D.C. Circuit in *Batterton v. Marshall*, 648 F.2d 694, 701–02 (D.C.Cir. 1980):

> Advance notice and public participation are required for those actions that carry the force of law. "[S]ubstantive" rules ... grant rights, impose obligations, or produce other significant effects on private interests. They also narrowly constrict the discretion of agency officials by largely determining the issue addressed....
>
> Non-binding action, in contrast, merely expresses an agency's interpretation, policy, or internal practice or procedure. Such actions or statements are not determinative of issues or rights addressed. They express the agency's intended course of action, its tentative view of the meaning of a particular statutory term, or internal housekeeping measures organizing agency activities. They do not, however, foreclose alternative courses of action or conclusively affect rights of private parties.

648 F.2d at 703.

The D.C. Circuit differentiates *policy statements* from substantive rules on the basis of two criteria:

> A policy statement is one that first, does not have "a present day binding effect," that is, it does not "impose any rights and obligations," and second, "genuinely leaves the agency and its decisionmakers free to exercise discretion."

*McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C.Cir.1988) (quoting *Community Nutrition Inst. v. Young*, 818 F.2d 943, 946 & n. 4 (D.C.Cir.1987)). Put another way, a statement of policy "does not establish a 'binding norm,'" it only "announces the agency's tentative intentions for the future." *Pacific Gas & Elec.*

---

**12.** The APA provides that rulemaking procedures must be followed when rules are promulgated other than "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553. The APA defines rules as:

the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency....

5 U.S.C. § 551(4).

**1114**

*v. FPC,* 506 F.2d 33, 38 (D.C.Cir.1974) (*quoted in Brock v. Cathedral Bluffs Shale Oil Co.,* 796 F.2d 533, 537 (D.C.Cir. 1986)).

Defendant's contention that its disposition handbook is excepted from the rule-making requirements because it is merely a statement of policy or procedure is unconvincing. The language of the disposition handbook and HUD's application of the policies contained therein demonstrate that it is not "just a 'musing about what the agency might do in the future,'" *McLouth Steel,* 838 F.2d at 1321, or a "statement[ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *American Bus Ass'n v. United States,* 627 F.2d 525, 529 (D.C.Cir.1980) (quotation omitted). The property disposition handbooks are compiled on roughly an annual basis by HUD and are provided to the field offices that implement HUD policies. The handbooks are lengthy, detailing an extensive number of HUD single-family disposition policies and programs. The foreward to the 1987 Handbook, to take a typical example, reads as follows:

> *This Handbook provides disposition procedures* for one-to-four family properties that are … in HUD's custody. [Property Disposition] directors are *required* not only *to make best use of procedures in this Handbook,* but also to develop and recommend for Headquarter's approval new or experimental programs as needed. [Property Disposition] activities not covered by this Handbook or by other relevant handbooks require Headquarters [sic] guidance and approval.

*Property Disposition Handbook, One–to–Four Family Properties* (Handbook No. 4310.5 Rev. 1) (April 13, 1987) (emphasis added).

HUD applies the policies in the handbook to nearly all, if not all, of the single-family properties of which HUD disposes. The Director of HUD's single-family disposition program averred that "HUD Field Offices are charged with the responsibility of carrying out property disposition policies and procedures as set forth in the Property Disposition Handbook and related issuances." Fourth Martin Declaration at ¶ 14. Although the policies are not intended to preclude the Secretary's discretion, they "set forth guidance where it is not contemplated that discretion is needed or warranted at the Field Office level." *Id.* In short, they clearly are "self-imposed controls over the manner and circumstances in which the agency will exercise its plenary power." *Pickus v. U.S.,* 507 F.2d at 1107, 1113 (D.C.Cir.1974).

The five policy changes plaintiffs specifically object to involve (1) the cessation of the use of purchase money mortgages, (2) the shift away from the practice of repairing houses before sale, (3) modification of the earnest money requirement, (4) restriction of the preference for owner-occupant bids, and (5) elimination of the right of first refusal for tenants and former mortgagors. These are not issues concerning the internal machinations of HUD. They substantially affect the capacity of persons to acquire HUD houses. Whether these are changes for the better is irrelevant: they are the result of HUD policies that "might have been differently articulated had [notice-and-comment] rulemaking been followed." *Pickus,* 507 F.2d at 1113. The policies contained in the disposition handbooks and related memoranda have significant consequences for those wishing to purchase HUD homes. They have "present-day binding effect" and limit the discretion of HUD decisionmakers. *See McLouth Steel Prods.,* 838 F.2d 1320. Consequently, HUD must promulgate these policies in accordance with the notice-and-comment rulemaking requirements of 24 C.F.R. § 10.

**C. *The McKinney Act***

The Stewart B. McKinney Homeless Assistance Act, 42 U.S.C. § 11301 *et seq.,* was intended "to use public resources and programs in a more coordinated manner to meet the critically urgent needs of the homeless." *Id.* § 11301(b)(2). Sections 501–502 of the Act, codified at 42 U.S.C. §§ 11411–12, sets out a process by which underutilized federal property is to be made available to assist the homeless. In

its decision denying the motion for preliminary injunction, this Court considered whether properties in the HUD single-family inventory were subject to disposition under the McKinney Act. After conducting an exhaustive analysis of the McKinney Act and its legislative history, the Court held that the McKinney Act did not apply to these HUD properties. 698 F.Supp. at 337–41. Plaintiffs have failed to cite any authorities or raise any arguments that were not previously considered by the Court. Thus, the Court reaffirms its holding that the McKinney Act does not provide a basis for the relief plaintiffs seek.

## V. CONCLUSION

Today the Court holds that HUD failed to consider its responsibilities under Section 1441 of the National Housing Act and violated its notice-and-comment regulations when promulgating rules relating to the disposition of single-family properties. The appropriate remedy is to remand the matter to the Secretary for further consideration of the single-family property disposition program in a manner consistent with this Memorandum. *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Environmental Defense Fund v. Costle*, 657 F.2d 275, 285 (D.C.Cir.1981); *Environmental Defense Fund v. Ruckelshaus*, 439 F.2d 584, 596 (D.C.Cir.1971).

### ORDER

Upon consideration of the parties cross-motion for summary judgment, the oppositions thereto, the argument of counsel in open court, and for the reasons stated in the accompanying Memorandum, it is by the Court this 27th day of July, 1989,

ORDERED that plaintiffs' motion for summary judgment be, and hereby is, granted in part and denied in part; and it is further

ORDERED that defendant's motion for summary judgment be, and hereby is, granted in part and denied in part; and it is further

ORDERED that defendant shall take action to comply with 42 U.S.C. § 1441 and 24 C.F.R. § 10 in a manner consistent with the accompanying Memorandum.